Brian Lee **CHERRIX**, Petitioner,

v.

Daniel A. **BRAXTON**, Warden, Sussex I State Prison, Respondent.

No. Civ.A. 00CV1377.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 28, 2000.

Michele Jill Brace, Washington, DC, Robert Lee Jenkins, Bynum & Jenkins, Alexandria, VA, for Petitioner.

Pamela Rumpz, Office of the Attorney General, Richmond, VA, for Respondent.

POST CONVICTION PROCEEDING

LEE, District Judge.

*SUPPLEMENTAL MEMORANDUM OPINION*
*TABLE OF CONTENTS*

I. Background ..................................................................760

II. The Court's Narrow Application of § 848(q) ................................762

III. Actual Innocence Under *Herrera* .........................................765
 A. Viability of Free–Standing Innocence Claim .............................766
 B. Clemency Alternative .................................................767

IV. Miscarriage of Justice under *Schlup* ....................................769

V. Authority of the Court to Order Petitioners to Retain and to Provide Access to
 Evidence .................................................................770
 A. Narrowness of January 9, 2001 Order ....................................770
 B. Source of the Court's Authority in 2254 Cases ...........................774
 1. The Court's Authority Under the Federal Rules of Civil Procedure .....775
 2. The Court's Authority to Order State Officials to Act ...................778
 3. The Court's Authority to Order the Retention of Evidence ...............781
 C. Overlap of State and Federal Realms ....................................784
 D. Inappropriateness of Mandamus Relief ..................................785

VI. Conclusion ...............................................................786

### SUPPLEMENTAL MEMORANDUM OPINION

THIS MATTER is before the Court on the request by the Fourth Circuit Court of Appeals to respond to the Warden of Sussex I State Prison, the Attorney General for the Commonwealth of Virginia, and the Accomack County Circuit Clerk of Court's Petition for Writ of Mandamus and/or Prohibition and Appeal from Order Granting Injunction. Petitioners move for relief from this Court's January 9, 2001 Order. granting the habeas petitioner's motion for DNA testing and motion for the retention and preservation of evidence. The Court submits this Supplemental Memorandum Opinion to clarify and reaffirm its January 9, 2001 Order.

The narrow issues before this Court are (1) whether it is within the district court's discretion to authorize funding under 21 U.S.C. § 848(q)(9) for the retesting of DNA evidence when the petitioner has made a preliminary showing of constitutional error and a new DNA rest is reasonably necessary no support his claims for relief by determining the origin of the seminal fluid found in the decedent's body; and (2) whether the Court is empowered to order the custodians of the evidence to make the evidence available to a private entity for testing. This Court holds that it is within its discretion to grant funding for DNA testing and to require the custodians

of the evidence to make it available for testing. *See* 21 U.S.C. § 848(q); 28 U.S.C. §§ 2254(2)(A)(ii), (2)(B).

The two motions before the district court were the [Habeas] Petitioner's Motion for DNA Testing and the [Habeas] Petitioner's Motion for Retention and Preservation of Evidence. The habeas petitioner requested funding from the federal court for deoxyribonucleic acid ("DNA") retesting of physical evidence collected from the decedent victim's body which would support the habeas petitioner's claims of constitutional error. The Warden of the Sussex I State Prison ("Warden") refused to conduct a DNA retest of the seminal fluid retrieved from the decedent victim's body, even though the Commonwealth of Virginia's ("Commonwealth") first DNA test used technology that is below today's standards, which rendered an inconclusive result. The new DNA testing methods could possibly procure conclusive evidence demonstrating that a third person committed the murder and sodomy which may ultimately exonerate the habeas petitioner of capital murder.

The Court granted the habeas petitioner's request for funds, and ordered that the custodians of the evidence make it available for testing, for three reasons. First, § 848(q) authorizes a district court to provide funding for services which are

reasonably necessary to support the habeas petitioner's petition for writ of habeas corpus. *See* 21 U.S.C. § 848(q). Second, the Court holds that discovery of the evidence is reasonably necessary for the dual purpose of supporting the habeas petitioner's claims of actual innocence and using innocence as a gateway to show that prejudice resulted from his counsel's ineffective assistance. *See Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Schlup v. Delo,* 513 U.S. 298, 326, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Third, Cherrix has shown good cause for DNA retesting. *See* RULES GOVERNING § 2254 CASES, Rule 6(a); 28 U.S.C. §§ 2254(2)(A)(ii), (2)(B). Therefore, based on the particular facts in this case, it is within the Court's discretion to order the retest of the seminal fluid under § 848(q).

## I. BACKGROUND

In 1997, habeas petitioner Brian Lee Cherrix ("Cherrix") was convicted of the 1994 murder and sodomy of Tessa Van Hart in an Accomack County Circuit. Court in Virginia.[1] The gruesome facts of the case are set forth by the Virginia Supreme Court. *See Cherrix v. Commonwealth,* 257 Va. 292, 513 S.E.2d 642, 645–646 (1999).

Ms. Van Hart was a pizza delivery woman who was dispatched to deliver an order for pizza. Ms. Van Hart was sodomized, shot twice in the head, and murdered by a lone assailant. At trial, the Commonwealth presented evidence showing that in 1996 Cherrix volunteered that he had information about the sodomy and murder of Ms. Van Hart, subsequently confessed to her sodomy and murder, and then led the police to recover a weapon that may have

been involved in the murder. At trial, Cherrix denied that he confessed. Cherrix asserted that he told the police he knew who committed the murder, that he was innocent, and that he had an alibi for the time of the offense. The jury convicted Cherrix of all the charges. The trial court, pursuant to the jury's recommendation, sentenced Cherrix to death for capital murder.[2] *See id.* Cherrix appealed the decision and also pursued state habeas relief in the Virginia Supreme Court. The Virginia Supreme Court denied both attempts to overturn the conviction. The day before Cherrix's scheduled execution date, this Court stayed his execution.

Prior to his submission of his federal petition for writ of habeas corpus, and pursuant to 21 U.S.C. § 848(q), Cherrix filed a motion for DNA retesting of the seminal fluid collected from Ms. Van Hart's anus. The circumstances surrounding the request for DNA retesting are as follows. In connection with the investigation of the case in 1994, the Commonwealth conducted DNA testing on fluid collected from Ms. Van Hart's anus and found the presence of seminal fluid. In conjunction with the autopsy of Ms. Van Hart, the medical examiner divided the material taken from her body into spermatozoa and non-spermatozoa fractions, which were then subject to Polymerase Chain Reaction "PCR" DNA testing. (Habeas Pet., Ex: App. 89.) The non-spermatozoa fractions were consistent with the DNA collected from Ms. Van Hart. (*See id.*) The PCR test results on the spermatozoa fractions were inconclusive. The test could not amplify the spermatozoa fractions; therefore, it was unable to ascertain the identity of the assailant who sodomized Ms. Van Hart and left the semi-

---

1. The specific charges are as follows: (1) capital murder during the commission of forcible sodomy; (2) use of a firearm during the commission of a murder; (3) forcible sodomy; (4) use of a firearm during the commission of forcible sodomy; and (5) possession of a firearm by a previously convicted felon.

2. The trial court also sentenced Cherrix to life imprisonment for his forcible sodomy conviction, eight years imprisonment for using a firearm in the commission of those offenses, and five years imprisonment for possessing a firearm after being convicted of a felony.

nal fluid in her body. The Commonwealth's theory of the case at trial was that a lone assailant murdered and sodomized the victim. Therefore, it is reasonable to infer that the person whose seminal fluid is found in Ms. Van Hart's anus was the perpetrator of this gruesome crime.

Six years later, DNA technology has advanced. Cherrix argues that by using current test models it is possible to make a conclusive determination of the origin of the seminal fluid found in Ms. Van Hart's body. Cherrix asserts that advances in DNA testing now make it possible to evaluate samples that were not amenable to DNA testing in 1994. The new methods, the Short Tandem Repeat ("STR") DNA test and the Mitochondrial Test, can render a conclusive opinion by evaluating substances other than spermatozoa that are contained within seminal fluid, such as epithelial cells and white blood cells. (Habeas Pet., Ex: App. 91–92.) Therefore, Cherrix moved for DNA testing, under 21 U.S.C. § 848(q), as reasonably necessary to support his petition for writ of habeas corpus, which contains claims of actual innocence and constitutional error.

While the DNA motion was pending, Cherrix filed a motion for the retention and preservation of evidence, asking the Court to order 10 separate state agencies to preserve the evidence pertaining to Ms. Van Hart's murder and Cherrix's prosecution, including any bodily fluids collected from. Ms. Van Hart. The Warden objected to the Court ordering any state agencies to act. On December 12, 2000, the Court conditionally granted Cherrix's motion for the retention and preservation of evidence and ordered the Virginia Attorney General and the Clerk of Court for Accomack County to preserve all evidence, including any bodily fluids collected from Ms. Van Hart that pertains to Ms. Van Hart's murder and Cherrix's prosecution. *See Cherrix v. Taylor,* Order (E.D.Va. Dec. 12, 2000) (conditionally granting motion for retention and preservation of evidence).

Subsequent to Cherrix's filing of his petition for writ of habeas corpus, and upon consideration of the petition and the evidence submitted in support thereof, the Court granted Cherrix's motion for funding for DNA retesting on the basis that such testing was reasonably necessary to support Cherrix's claims for federal habeas relief. *See Cherrix v. Taylor,* No. 00–1377, Order (E.D.Va. Jan. 9, 2001) (granting motion for DNA testing and motion for retention and preservation of evidence). Specifically, the Court granted funding for a private laboratory to conduct DNA testing and ordered the Virginia Attorney General and the Clerk of Court for Accomack County to make the requisite materials available for the testing. (*See id.*)

The next day, the Court denied the Warden's oral motion to stay the January 9, 2001 Order because the Warden set forth no basis for his claim. *See Cherrix v. Taylor,* No. 00–1377, Order (E.D.Va. Jan. 10, 2001) (denying motion to stay). That same day, the Warden, the Virginia Attorney General, and the Clerk of Court for Accomack County ("Petitioners") filed in the Fourth Circuit Court of Appeals an application for an emergency stay of the January 9, 2001 Order, and a petition for writ of mandamus and/or prohibition and appeal from the January 9, 2001 Order. On February 5, 2001, the Fourth Circuit granted Petitioners's application for an emergency stay. Pursuant to Federal Rule of Appellate Procedure 21(b), the Fourth Circuit invited this Court to submit a response to the petition for writ of mandamus. *See* Fed.R.App.P. 21(b)(4) (stating that the court of appeals may invite or order the trial-court judge to address the petition).

This Court accepts the Fourth Circuit's invitation to respond to the arguments asserted by Petitioners, which were never presented to the district judge in connection with their oral motion for a stay. After consideration of Petitioners' petition for writ of mandamus, the Court reaffirms its ruling that it is within this Court's

discretion to require Petitioners to make the evidence available so that a private laboratory may conduct DNA testing that is reasonably necessary to support Cherrix's petition for writ of habeas corpus.

## II. THE COURT'S NARROW APPLICATION OF § 848(q)

■ The Court employed § 848(q) within the limit of the powers the statute grants. Section 848(q) provides:

In any post conviction proceeding under section 2254 ... seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

21 U.S.C. § 848(q)(B). Section 848(q) is a funding statute that authorizes the Court to disburse federal funds so that a habeas petitioner's attorneys can obtain investigative and other services on behalf of the habeas petitioner. *See* 21 U.S.C. §§ 848(q)(4)(B), (q)(9). In its petition for a writ of mandamus, Petitioners argue that this Court exceeded its authority under 21 U.S.C. § 848(q), but the Court used § 848(q) only for the function it is meant to provide: the provision of funding. In arguing that the Court should not have granted funding for the services of DNA testing, Petitioners fail to recognize the parameters of a district court's discretion under the statute. Section 848(q) requires a district court to provide for the furnishing of investigative and other services upon a showing that such services are "reasonably necessary" to a habeas petitioner's development of his case. *See* 21 U.S.C. § 848(q)(9) (stating that a habeas petitioner shall be entitled to the furnishing of services upon a showing of reasonable necessity); *McFarland v. Scott,* 512 U.S. 849, 854, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) (stating that § 848(q) on its face grants indigent capital defendants a mandatory right to qualified legal counsel and related services). Once Cherrix made a showing that DNA testing is "reasonably necessary" to his habeas petition, this Court had the discretion to provide for funds for testing or discovery that may be necessary to support the habeas petition.

Cherrix has satisfied the standard of this and other courts for demonstrating that investigative services are "reasonably necessary." This Circuit has stated that the services of an expert are reasonably necessary if either: (a) the services are needed to prepare the claims in the habeas petition, or to obtain evidence not yet acquired to support a claim in the habeas petition; or (b) the habeas petition raises claims entitling the petitioner to a hearing at which such expert would testify.[3] *See Lawson v. Dixon,* 3 F.3d 743, 753 (4th Cir.1993) (holding that habeas petitioner did not need services of psychiatrist because: (i) petitioner had already filed his petition, and so did not need psychiatrist to prepare his claims; and (ii) psychiatrist had already formed an opinion on the elements of petitioner's claim, so petitioner had already acquired the evidence sought). As will be explained in great detail herein, Cherrix raises claims of constitutional violations and actual innocence that can only be explored through DNA analysis of Cherrix's blood and the physical evidence taken from the murder scene. *See infra* sections II, III, and IV. Therefore, Cherrix satisfies the first standard set forth by the Fourth Circuit for demonstrating that the requested DNA services are "reasonably necessary."

The Fifth Circuit has stated that a habeas petitioner must be able to do at least one of the following to show reasonable

---

**3.** For the purposes of Cherrix's motion, the equivalent would be that services for DNA testing would be reasonably necessary if the habeas petitioner raises claims entitling the petitioner to a hearing at which the testing results would be used as evidence.

necessity: (a) state how he would employ experts in preparation for an evidentiary hearing; (b) demonstrate that experts will show that an aspect of the habeas petitioner's trial violated the petitioner's constitutional rights; or (c) where petitioner seeks an expert in order to raise forensic issues not raised at trial, appeal, or in a state habeas proceeding, show a miscarriage of justice, or cause and prejudice. *See Fuller v. Johnson*, 114 F.3d 491, 502 (5th Cir. 1997) Cherrix has demonstrated that DNA services are reasonably necessary under all three standards set forth by the Fifth Circuit. The expert services of a DNA laboratory could provide Cherrix with evidence supporting his claim that he did not commit the rape and murder of Ms. Van Hart. This goes to any actual innocence and constitutional error claims that Cherrix could present at an evidentiary hearing. In addition, Cherrix seeks to demonstrate that there will be a miscarriage of justice if a person who is actually innocent is executed. Cherrix needs the DNA testing services to support his claim that he is actually innocent. Thus, Cherrix meets the Fifth Circuit's standard for a showing that DNA testing is "reasonably necessary" to his habeas case.

Texas district courts recognize yet another grounds upon which certain investigative services may be "reasonably necessary" to a habeas petitioner's case. In the case of *Patterson v. Johnson*, the court noted that funds for investigative services may be "reasonably necessary" at the pre-petition stage to enable a habeas petitioner to research and identify the factual bases of possible claims. 2000 WL 1234661, *2 (N.D.Tex. Aug. 31, 2000). The *Patterson* court noted investigative funds may be necessary to permit a habeas petitioner to state claims with sufficient particularity. *See id.* Like the *Patterson* court, this Court also concluded in issuing its January 9, 2000 Order that "it made little sense" to force a habeas petitioner to make good

faith claims of constitutional violations— and, in this case, actual innocence—without supplying the petitioner with the resources to investigate his claims' factual basis and validity. Therefore, Cherrix has demonstrated a reasonable necessity sufficient enough to stand up to the standards of not only this circuit, but of other jurisdictions as well.

Moreover, in its determination of whether DNA testing was reasonably necessary to Cherrix's case, this Court properly considered, among other factors, the recommendations contained in a Report sponsored by the Attorney General of the United States. *See* National Commission on the Future of DNA Evidence, POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, at 4–5 (NIJ1999) [hereinafter "1999 REPORT"], *available at* <http://www.ncjrs.org/pdffiles1/nij/177626. pdf>. According to the Report, Cherrix's habeas case is one for which DNA testing should be granted because DNA testing may exonerate Cherrix. *See id.*

The National Institute of Justice published a report in 1996 profiling the cases of 28 different individuals who had been convicted of crimes and subsequently exonerated by post-conviction DNA tests.[4] *See* National Commission on the Future of DNA Evidence, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL, at 34–79 (NIJ1996) [hereinafter "1996 REPORT"], *available at* <http:// www.ncjrs.org/pdffiles/dnaevid. pdf>. In response to the report's concerns, and to maximize the value of forensic DNA evidence in the criminal justice system, Attorney General Janet Reno established the National Commission on the Future of DNA Evidence. *See* 1999 REPORT, at iii. The report, entitled *Postconviction DNA Testing: Recommendations for Handling Requests* ("1999 Report"), provides law enforcement officials with information and

---

4. A 1999 update to these numbers revealed that 60 people since 1992 had been convicted of crimes and exonerated by DNA evidence. *See* 1999 REPORT, at 2.

guidelines for addressing requests for post-conviction DNA testing. *See generally* 1999 REPORT.

The 1999 Report recommends that DNA testing always be allowed in cases like Cherrix's. *See id.* at 3 (stating that prosecutors and defense counsel should concur on the need for DNA testing in Category 1 cases). The Report categorizes requests for post-conviction DNA testing into five categories and provides a sound framework for analysis of requests. Category 1 cases are cases in which biological evidence was collected and still exists, and if such evidence is subjected to DNA testing or retesting, exclusionary results will exonerate the habeas petitioner. *See id.* at xiii, 4. The Commission's first example of a Category 1 case closely approximates Cherrix's case:

> Petitioner was convicted of the rape of a sexually inactive child. Vaginal swabs were taken and preserved. DNA evidence that excludes the petitioner as the source of the sperm will be dispositive of innocence. Note that in a case such as this, the victim's DNA—also obtainable from the vaginal swab—operates as a control that confirms that the correct sample is being tested.

*Id.* at 4. Like Cherrix's case, this first example of a Category 1 case is one in which DNA evidence excludes the habeas petitioner as the source of the seminal fluid in a forced sexual penetration case, thereby providing evidence dispositive of innocence. *See id.* at 4 (setting forth examples 1 and 4 that demonstrate the import of DNA testing to cases like the instant one). The Commission recommends that DNA testing be allowed in Category 1 cases, and Cherrix's case is clearly a Category 1 case.

Throughout Cherrix's prosecution, the Commonwealth has asserted that a sole perpetrator sodomized and murdered Ms. Van Hart. Therefore, if the DNA retesting of the fluid on the anal swab shows that someone other than Cherrix sodomized Ms. Van Hart and left the seminal fluid in her body, then it is arguable that a third person, and not Cherrix, would be the perpetrator of this horrible crime.[5] Such a theory is consistent with the evidence presented at Cherrix's trial. The central evidence used to convict Cherrix consisted of (1) an officer's written documentation of Cherrix's confession that he shot Ms. Van Hart twice in the head and sodomized her,[6] and (2) Cherrix's leading the police to the location of a gun which may have been used in the murder. Throughout all of his proceedings, Cherrix has maintained his innocence, and no physical evidence conclusively has connected the identified gun to Cherrix or to Ms. Van Hart's murder. Cherrix moves for a retest of the seminal fluid collected from Ms. Van Hart's body because new DNA tests could possibly prove what the original test could not: Cherrix's potential innocence. Cherrix can utilize the facts in his case, his claims of constitutional error, and the possible evidence procured from the DNA test in an attempt to make a truly persuasive showing of innocence coupled with constitutional error in his trial. *See Schlup*, 513 U.S. at 327, 115 S.Ct. 851. Additionally, the Supreme Court in *Herrera v. Collins* left open the question of whether a truly

---

5. *Cf. Hunt v. McDade*, 205 F.3d 1333, 2000 WL 219755, *3 (4th Cir.2000) (unpublished) (finding that DNA was not sufficient to prove the petitioner's actual innocence because multiple assailants were involved in the crime, and further noting that cases where courts have exonerated individuals post-conviction have been single assailant DNA cases).

6. Cherrix's confession does not preclude a person's actual innocence of a crime. *See* Bruce M. Lyons, *New Committee Looks at DNA and the Death Penalty*, CRIM.JUST., Spring 2000, at 1 (reporting that, among DNA exonerations, twenty-one percent of wrongful convictions were based on confessions that were made by or attributed to the defendant); *see generally* Richard Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, J. OF CRIM.L. & CRIMINOLOGY, Winter 1998 (reporting statistics on the unreliability of confessions).

persuasive showing of innocence can be grounds for federal habeas relief. 506 U.S. at 427–28, 113 S.Ct. 853. Therefore, this is a Category 1 case, and, under 21 U.S.C. § 848(q), DNA testing is reasonably necessary to Cherrix's claims. The testing gives Cherrix the opportunity to develop evidence which could substantiate his habeas claims.

The Court finds it ironic that the Commonwealth refuses to conduct retests of the evidence in this case, considering who is among the membership of Attorney General Janet Reno's Commission. Paul B. Ferrera, Director of the Division of Forensic Sciences for the Commonwealth of Virginia, is a member of the national commission that set forth the DNA recommendations and category guidelines. *See id.* at vi. The Commonwealth has stated in its pleadings that it refuses to retest the DNA evidence in this case in its own laboratory. (Resp. in Opp'n to Pet.'s Mot. for DNA Testing at 1–2 (stating, in response to Cherrix's request that the evidence be transported to the Virginia Department of Forensic Sciences, that this Court does not have authority to direct or compel the Director of Department of Corrections "to do anything").) Yet, at the same time, the Commonwealth objects to the federal court affording Cherrix access to evidence and to testing by an outside laboratory. The Commonwealth maintains its objection despite a showing that Cherrix's claims meet the criteria proposed by the Attorney General's national commission of which the Commonwealth's own Director of Forensic Science is a member. (*Id.*) The fact that the Court considered the Commission's observations further supports the conclusion that the Court appropriately applied the § 848(q) standard in its January 9 Order in granting funds for the DNA testing.

The Court's respect for the import of the "reasonably necessary" standard is evidenced by the Court's careful consideration of the propriety of providing funds with respect to each of the services Cherrix requested. In its January 9 Order, the Court denied Cherrix's request for funds for a mental health expert. (Jan. 9 Order at 5–6.) The Court conducted a thorough and reasoned analysis before concluding that the services of Dr. John L. Bulette, Cherrix's proffered mental health expert, were not reasonably necessary for Cherrix's case. (*Id.* at 5–6.) The Court conducted just as thorough an evaluation under the "reasonably necessary" standard in deciding to disburse funds for DNA testing. The Court's careful consideration of the DNA issue is explored more fully below in the discussion of Cherrix's need to retest the DNA evidence.

### III. ACTUAL INNOCENCE UNDER HERRERA

Cherrix asserts that the execution of a person actually innocent of the crime of which he was convicted would be in violation of his Eighth Amendment right against cruel and unusual punishment. *See generally* U.S. CONST. amend. VIII. Cherrix asserts that the evidence derived from the retest of the DNA evidence would help him to prove his claim of actual innocence. Therefore, according to Cherrix, the DNA retest is reasonably necessary under 21 U.S.C. § 848(q). Petitioners argue that "[c]laims of actual innocence based on newly-discovered evidence *have never been held* to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Herrera,* 506 U.S. at 400, 113 S.Ct. 853 (emphasis added); *See also Wilson v. Greene,* 155 F.3d 396, 404 (4th Cir.1998); *Spencer v. Murray,* 18 F.3d 229, 236 (4th Cir.1994). This Court agrees.

Ultimately, this Court makes no finding as to the validity of Cherrix's *Herrera* claim for actual innocence based on newly-discovered evidence because no new evidence is before this Court. Ordering a new DNA test has the potential of producing three different outcomes. First, the test can prove inconclusive, in which case no newly-discovered evidence would be be-

fore the Court, and the *Herrera* inquiry would be futile. Second, the test results can show that Cherrix sodomized Ms. Van Hart and deposited the seminal fluid into her body, in which case the evidence would moot his claims of innocence. Third, the test results can show a third party deposited the seminal fluid into Ms. Van Hart's body. If the test results implicate a third party, then the issue would be placed before the Court of whether such evidence, coupled with the other allegations of constitutional error, would be sufficient to grant Cherrix federal habeas relief. *See, e.g., Wilson,* 155 F.3d at 404–405 (undertaking a preliminary inquiry as to whether the habeas petitioner's claims fit within the narrow scope of an actual innocence claim, then finding that the petitioner's claims failed to reach such standard); *Spencer,* 18 F.3d at 236 (same). However, the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits.

## A. Viability of Free–Standing Innocence Claim

The *Herrera* court left open the question of whether a truly persuasive showing of actual innocence could be an independent constitutional basis for federal habeas relief. *See Herrera,* 506 U.S. at 427–429, 113 S.Ct. 853. *Herrera* was a 6:3 decision. At least three of the Justices who concurred in the opinion did not foreclose on the viability of actual innocence serving as a free-standing claim for federal habeas relief. Justices O'Connor and Kennedy did not reach the decision of whether a truly persuasive showing of innocence could be an independent basis upon which to grant federal habeas relief. Justices O'Connor and Kennedy rested on the assertion that the United States Supreme Court would

never have to decide such an issue because any truly persuasive claim of innocence would be resolved by executive clemency. *See Herrera,* 506 U.S. at 427, 113 S.Ct. 853 (O'Connor, J., concurring) ("the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence. That difficult question remains open. If the Constitution's guarantees of fair procedure and the safeguards of clemency and pardon fulfill their historical mission, it may never require resolution at all."). Moreover, Justice White held that a persuasive showing of "actual innocence" made after trial based on newly-discovered evidence could render the execution of a habeas petitioner unconstitutional. *See id.* at 429, 113 S.Ct. 853 (White, J., concurring).

Justices O'Connor, Kennedy, and White were convinced by the facts that Herrera's free-standing claim of actual innocence was not sufficient to warrant an independent constitutional claim. *See id.* at 427, 429, 113 S.Ct. 853. First, Herrera's newly-discovered evidence consisted of affidavits. *See id.* at 417, 113 S.Ct. 853. Second, the affidavits were given over eight years after the trial. *See id.* at 418, 113 S.Ct. 853. Third, the affidavits themselves contained internal inconsistencies. *See id.* Finally, when the affidavits were considered with the evidence presented at trial—two eyewitness identifications, numerous pieces of circumstantial evidence, and a handwritten letter where Herrera apologized for killing the officers—the evidence still pointed strongly toward the petitioner's guilt. *See id.* Ultimately, the newly-discovered affidavit evidence did not meet the standard of a truly persuasive showing of actual innocence.[7]

7. The majority in *Herrera* did not set forth the standard that a person must reach for a truly persuasive showing of actual innocence. However, in *Schlup,* the Supreme Court made several references to the strength of the evidence needed to be produced to sustain such a claim. *See Schlup,* 513 U.S. at 316, 115 S.Ct. 851. (stating that "the evidence of inno-

cence would have had to be strong enough to make his execution 'constitutionally intolerable' even if his conviction was the product of a fair trial.") The *Schlup* Court stated that the new facts would have to unquestionably establish the person's innocence. *See id.* at 317, 115 S.Ct. 851 ("[i]f there were no question about the fairness of the criminal trial, a

The circumstances in Cherrix's case are different. The evidence to be discovered in Cherrix's case constitutes DNA test results on seminal fluid seized from the body of the victim, which may be highly probative of the perpetrator's identity. The persuasiveness of forensic examination evidence on a claim of innocence is unquestionable. *See* 1999 REPORT at xiii. The United States Attorney General's 1999 Report acknowledges DNA testing as a key forensic technique for identifying criminals when biological tissues are left at a crime scene, and acknowledges DNA testing's proper use as a means to help convict or exonerate people of crimes. A national survey of forensic crime laboratories reported that DNA testing was used to exclude suspects in about 20–25% of its cases. *See* 1996 REPORT at 20. Courts throughout the country have found that DNA is highly probative evidence of guilt and innocence,[8] and DNA testing is becoming a leading basis upon which wrongfully convicted individuals have secured releases from convictions.[9] Overall, DNA test results have led to more than 60 people being exonerated of their crimes since 1992. *See* 1999 REPORT at 2.

Cherrix argues that the new STR and Mitochondrial methods of DNA testing will produce new evidence that will exonerate him of capital murder by showing that someone other than he sodomized Ms. Van Hart and left the seminal fluid in her body. If Cherrix approached this Court with a DNA test in hand, issued from a Virginia state DNA testing lab, stating that some-

one else's seminal fluid was found in Ms. Van Hart's body, then this Court would not be required to ignore such persuasive evidence of actual innocence. Cherrix cannot return to the Virginia courts to request retesting now because his conviction is final. *See* VA.SUP.CT.RULES, Rule 1:1; VA. CODE § 8.01–654(A)(1). Virginia law does not have a post-conviction mechanism for Cherrix to present his request, or even to present the newly-discovered rest results. Moreover, such newly-discovered evidence would illuminate Cherrix's federal habeas claims that his conviction is unconstitutional. As stated above, this Court did not abuse its discretion in examining the facts of the case, and the persuasive nature of DNA testing, to reach its conclusion that ordering a DNA retest was reasonably necessary to support Cherrix's petition for federal habeas relief.

## B. Clemency Alternative

■ Petitioners argue that Cherrix is not entitled to federal habeas relief on the grounds of newly-discovered evidence because Cherrix has failed to exhaust his state remedy of seeking clemency. It is true that the United States Supreme Court and this Circuit have acknowledged that normally a claim of actual innocence based on newly-discovered evidence is an issue to be reserved for clemency actions. *See Herrera,* 506 U.S. at 417, 113 S.Ct. 853 (acknowledging that the traditional remedy for claims of actual innocence based on late findings of newly-discovered evidence has been executive clemency); *Royal v.*

---

*Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the habeas petitioner's] innocence.")

8. *See, e.g., Spencer v. Commonwealth,* 240 Va. 78, 393 S.E.2d 609, 621 (1990) (holding that the DNA tests were properly admitted a jury trial which resulted in Spencer's capital murder conviction). The same DNA tests used to help convict Spencer resulted in the exoneration of David Vasquez, who had pled guilty to the crime and had been sentenced to 35 years in prison. *See* 1996 REPORT at 73.

9. *See Toney v. Gammon,* 79 F.3d 693, 700 (8th Cir.1996) (holding that the district court abused its discretion by denying the habeas petitioner's motion to conduct DNA testing which was unavailable at trial); *Watkins v. Miller,* 2000 WL 680418, *1 (S.D.Ind. May 16, 2000) (affirming its order for release of the habeas petitioner after DNA evidence showed he was actually of the murder); *People v. Dabbs,* 154 Misc.2d 671, 675–76, 587 N.Y.S.2d 90 (1991) (ordering post-conviction DNA testing and vacating conviction based on DNA evidence test results in a rape case).

*Taylor,* 188 F.3d 239, 243 (4th Cir.1999) ("[W]hen available, state clemency proceedings provide the proper forum to pursue claims of actual innocence based on new facts.")

The argument that clemency is the proper course to pursue using newly-discovered evidence still supports Cherrix's claims for DNA testing. Section 848(q) of Title 21 of the United States Code encompasses claims for a habeas petitioner's compensation of fees incurred during Virginia state clemency proceedings. *See Strickler v. Greene,* 57 F.Supp.2d 313, 317–18 (E.D.Va.1999) (holding that § 848(q) allows funding for services that are reasonably necessary in the habeas petitioner's pursuit of clemency from the Governor of Virginia); *see also Hill v. Lockhart,* 992 F.2d 801, 803 (8th Cir.1993) (stating that funding for services are reasonably necessary under § 848(q)(10) if the request is made as part of a non-frivolous federal habeas corpus proceeding and the state law provides no avenue to obtain compensation for these services). Therefore, as an alternative to his petition for habeas relief, the Court's grant of funding under § 848(q) would serve as a legitimate basis upon which to equip Cherrix's counsel with the tools needed to adequately pursue a clemency proceeding.

▮ This Court should not be placed in the position of having to deny an inmate access to DNA testing because he failed to seek clemency; nor should the Court be placed in the position of having to deny an inmate the opportunity to enter the executive clemency process armed with potentially exculpatory DNA test results. The issue of clemency must be analyzed within the context of the motion before the Court. Clemency is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted. Cherrix is making a request for DNA retesting that is reasonably necessary to demonstrate constitutional error at his trial and that he is actually innocent. *See Herrera,* 506 U.S. at 412, 113 S.Ct. 853. The United States Supreme Court has acknowledged that the execution of someone who is actually innocent is the quintessential miscarriage of justice.[10] *See Schlup,* 513 U.S. at 324–25, 115 S.Ct. 851. Without the DNA testing, it would be futile for Cherrix to seek clemency because he has no new evidence upon which to make a truly persuasive claim for Clemency.

It is unlikely that a viable petition for clemency is available to Cherrix without the persuasive conclusions of the DNA tests. The Governor of Virginia is not required to review or accept for submission any clemency petition, even if the applicant presents compelling evidence of actual innocence. *See* VA. CONST., ART. V, § 12; VA.CODE § 53.1–229, –230 (2000). Moreover, "most of the Virginia proceedings than culminated in executive clemency began in court with successful requests for access to court exhibits containing critical biological evidence that was ultimately subjected to DNA testing." *See* 1999 REPORT at 17.

As an indigent defendant, Cherrix applied to this Court for funding to conduct DNA retesting on evidence which is within the Commonwealth's possession. The results of this retest may create newly-discovered evidence exonerating Cherrix of Ms. Van Hart's murder. If the newly-discovered evidence exonerates Cherrix, then the Court may have to address whether Cherrix's failure to seek clemency presents a bar to his quest for federal habeas relief. As of now, this Court makes no determination on the newly-discovered evidence and Cherrix's claims of actual innocence. This Court only holds that the discovery of DNA evidence is reasonably necessary to support Cherrix's case. Therefore, it is within the Court's

10. The need to prevent a miscarriage of miscarriage will be explored more fully below.

*See infra* section IV.

discretion no order DNA testing under 21 U.S.C. § 848(q).

## IV. MISCARRIAGE OF JUSTICE UNDER SCHLUP

 Even if this Court were to find that Cherrix cannot assert an independent claim of actual innocence under *Herrera*, the DNA tests are reasonably necessary to · serve as a gateway to allow claims that may be procedurally barred to be heard on the merits. *See Schlup*, 513 U.S. at 327, 115 S.Ct. 851. A habeas petitioner is procedurally barred from litigating a constitutional claim in federal court if the petitioner has failed to assert the claim in a prior state proceeding. *See generally id.* However, newly-discovered evidence showing factual innocence may serve as a gateway to have the habeas petitioner's procedurally barred constitutional claims heard on the merits, and ultimately, to prevent a fundamental miscarriage of justice. *See id.* Cherrix did assert an ineffective assistance of counsel claim during his state habeas proceedings. However, Cherrix's counsel never sought DNA testing which could at this point prove that, but for counsel's ineffectiveness, the result of the proceeding would have been different. Therefore, Cherrix may be able to assert such claims of ineffective assistance of counsel before this Court because they are based on newly-discovered evidence that could demonstrate factual innocence.

 To assert a constitutional claim of ineffective assistance, the habeas petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851 (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* The reviewing court should consider the "probative force of relevant evidence that was either excluded or un-

available at trial." *See id.* at 327–28, 115 S.Ct. 851. The new facts need only raise sufficient doubt about a habeas petitioner's guilt to undermine confidence in the result of the trial and to establish a threshold showing of innocence sufficient to justify a review of the merits of the petitioner's constitutional claims. *See id.* at 317, 115 S.Ct. 851.

Cherrix claims in his habeas petition that his confinement violates his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the Constitution. (Habeas Pet. at 26.) Of relevance to this motion, Cherrix argues that his trial counsel violated his Sixth Amendment right to the effective assistance of counsel and that, but for such ineffectiveness, he would have been exonerated of the crimes involved. *See Strickland*, 466 U.S. at 687–91, 104 S.Ct. 2052. Under *Strickland*, a court must determine (1) whether the identified acts or omissions of counsel were outside the wide range of professionally competent assistance, and (2) whether there was a reasonable possibility that but for counsel's unprofessional performance the result of the proceeding would have been different. *See id.* at 690, 694, 104 S.Ct. 2052. Cherrix states that his trial counsel unreasonably failed to conduct an effective cross-examination of the Commonwealth's forensic pathologist or to obtain an independent expert in order to challenge and rebut the pathologist's testimony concerning the 1994 seminal fluid DNA test results. (Habeas Pet. at 92–93.) Cherrix argues further that his rights were violated by his trial counsel's failure to secure evidence that may have demonstrated than he did not sodomize and murder Ms. Van Hart. (Habeas Pet. at 89–96.) Forensic tests on seminal fluid in a murder and sodomy prosecution are critical evidence that weigh heavily in a determination of guilt. In this case, the then existing 1994 DNA testing methods were technologically inferior to recent DNA testing methods, and resulted in an inconclusive determination of the origin of the seminal fluid. It does

not appear that further tests were conducted when Cherrix became a suspect in 1997. Trial counsel's failure to pursue forensic evidence in 1997 which bears directly on guilt or innocence in a capital case may amount to error warranting federal habeas relief. *See Jones v. Wood,* 114 F.3d 1002, 1008–1009. (9th Cir.1997); *Toney v. Gammon,* 79 F.3d 693, 700 (8th Cir.1996); *Henderson v. Sargent,* 926 F.2d 706, 712–14 (8th Cir.1991); *Bliss v. Lockhart,* 891 F.2d 1335, 1342–43 (8th Cir. 1989); *Jenkins v. Scully,* 1992 WL 32342 (W.D.N.Y. Feb. 11, 1992).

The results from the requested DNA retests have the possibility of showing that Cherrix did not sodomize Ms. Van Hart and leave the seminal fluid taken from her body. As allowed in *Schlup,* Cherrix seeks to utilize this evidence of actual innocence to support his claim that his counsel's representation violated his Sixth Amendment right to the effective assistance of counsel. This Circuit has previously found with regard to *Schlup*-type claims of innocence that "DNA evidence that the defendant ... was not the one who contributed the seminal fluid found in the semen samples taken from the victim or her clothing established the requisite probability that a reasonable jury would not have returned a guilty verdict." *Hunt v. McDade,* 205 F.3d 1333, 2000 WL 219755, *3 (4th Cir. 2000) (unpublished).[11] Cherrix's requested DNA evidence can establish the requisite possibility that would enable a jury not to return a guilty verdict because, as explained earlier, it can eliminate Cherrix as the one who contributed the seminal found in Ms. Van Hart's body.[12] Therefore, Cherrix's request for DNA testing is reasonably necessary to support his claim that he was deprived of his Sixth Amendment right to the effective assistance of counsel, and that this deprivation resulted in the incarceration of an innocent man.

## V. AUTHORITY OF THE COURT TO ORDER PETITIONERS TO RETAIN AND TO PROVIDE ACCESS TO EVIDENCE

### A. Narrowness of January 9, 2001 Order

Petitioners take exception to their understanding of the Court's January 9, 2001 Order as directing the Attorney General and the Clerk of the trial court to undertake specific tasks in conjunction with Cherrix's request for DNA testing (Pet. for Writ of Mandamus at 9.) Petitioners argue that 21 U.S.C. § 848(q)(9) does not grant the district court the authority to "direct or compel" the Attorney General to do anything. (*Id.* at 10.) Petitioners assert that, in effect, this Court is enlisting the Attorney General and the Clerk to gather evidence for Cherrix, thereby making them investigators for Cherrix in the development of his case. (*Id.* at 11.) Petitioners' argument lacks merit in two respects: (1) Petitioners mischaracterize the scope of the Court's January 9, 2001 Order, and (2) Petitioners fail to recognize the long-established authority of the Court to order custodians of records and evidence, including state officials, to make

11. *See also Commonwealth v. Reese,* 444 Pa.Super. 38, 663 A.2d 206, 207 (1995) (holding that DNA test results warranted a new trial of a post-conviction petitioner who was convicted of rape and kidnaping); *State v. Hicks,* 195 Wis.2d 620, 536 N.W.2d 487, 492 (1995) (holding that a new trial was necessary due to the petitioner's counsel's failure to seek DNA testing on hairs gathered from the crime scene); *State v. Hammond,* 221 Conn. 264, 604 A.2d 793, 807–08 (1992) (holding that a new trial was warranted and stating that the defendant was entitled to have DNA testing done on vaginal swabs taken from the victim); *State v. Thomas,* 245 N.J.Super. 428, 586 A.2d 250, 254 (1991) (reversing order denying motion for DNA testing and stating that if the DNA test results indicated that the defendant was not the assailant, the trial court had the option of either conducting a hearing on the evidence or ordering a new trial).

12. The seminal fluid was the Commonwealth's most important evidence of sexual activity in connection with the murder. Without proof of the sexual assault, the murder may not have been capital murder. (Habeas Pet. at 28 (citing J.A. at 1085.))

accessible those records or evidence and to retain and preserve those records or evidence.

This Court's January 9, 2001 Order conditionally granted Cherrix's Motion for DNA testing upon consideration of his Petition for Writ of Habeas Corpus, without ruling on the merits of Cherrix's habeas corpus claims. The Court found that allowance of fees for DNA testing was reasonably necessary to support Cherrix's application for a writ of habeas corpus. *See* 21 U.S.C. § 848(q)(9). Accordingly, the Court set forth the conditions under which Cherrix would receive funds for the DNA testing. The Court took no position at that time regarding the merits of whether DNA testing would be admissible to support the allegations of Cherrix's claim, but found that DNA testing was appropriate based on the preliminary showing made in the habeas petition.

 In consideration of a habeas petitioner's request for discovery, the Court may provide a habeas petitioner investigative services to support reasonable claims in support of the petition. Just as the Court has the authority to appoint investigators or psychiatrists to assist indigent persons in the litigation of their cases, the Court may order the provision of a forensic scientist to perform DNA testing to aid a petitioner in support of his petition for habeas corpus. The provision of testing is not a judgment that a particular claim will be entertained. *See In re Warden, Kentucky State Penitentiary v. Gall,* 865 F.2d 786, 789 (6th Cir.1989). The Court cannot formulate a ruling on Cherrix's habeas petition until it has the opportunity to consider evidence acquired through the retesting of the DNA. A conclusive finding regarding the merits of Cherrix's claims is a determination for a later date. *See Bracy v. Gramley,* 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (finding that habeas petitioner was entitled to discovery of documents to support his claim, even though strong possibility existed that petitioner would be unable to obtain evidence

sufficient to support his claim). In its January 9, 2001 Order, The Court merely acted to ensure that an indigent individual had access to all reasonable avenues of discovery so that he could develop his case. *See McFarland v. Scott,* 512 U.S. at 854, 114 S.Ct. 2568 (stating that § 848(q)(4)(B) "grants indigent capital defendants in post-conviction proceedings a *mandatory right* to qualified legal counsel and related services" [emphasis added] ); *Coleman v. Vasquez,* 771 F.Supp. 300, 303 (N.D.Cal. 1991) (stating that purpose of § 848(q) is to put indigent defendants as nearly as possible in same position as nonindigent defendants) (citing *United States v. Sanders,* 459 F.2d 1001, 1002 (9th Cir.1972)); 21 U.S.C. §§ 848(q)(4)(B), (q)(9).

Petitioners' writ of mandamus demonstrates an additional lack of understanding of the scope of the Court's January 9 Order in its statements of concern regarding the compromise to the integrity of the evidence to be preserved and tested. Contrary to Petitioners' argument, this Court did not order that evidence be "turned over" to Cherrix. This Court was concerned with granting Cherrix "access" to evidence. (Jan. 9 Order at 2.) The Court was equally concerned with ensuring that the evidence was not destroyed pending Cherrix's access to the evidence. (*Id.* at 2–3.) As stated by the Seventh Circuit, both litigants *and* "[j]udges must be vigilant to prevent the destruction of evidence." *Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1156 (7th Cir.1998). The Court has not taken any action that compromises the integrity of the evidence.

The Court's Order did not provide for the final testing of the evidence, only for its preservation and for testing funds. At the time of the Court's January 9 Order-and presently-the Court intended to conduct a hearing to determine how the DNA testing would proceed. *See* 1999 REPORT, an xvi (recommending such a hearing). The Court expected both the Commonwealth and the parties to participate in structuring conditions for the testing of

the requested evidence in order to protect the integrity of the evidence and to ensure equal access to all parries.

The procedure the Court adopts for the analysis of the evidence will address the Petitioners' concern than Cherrix may consume the remaining forensic evidence and that the integrity of the evidence be maintained. (Pet. for Writ of Mandamus at 14.)[13] Attorney General Janet Reno's 1999 Report on Post-conviction DNA Testing provides guidelines for adopting procedures for DNA testing. *See* 1999 REPORT, at 52–53. The report recommends that courts set an informal conference with counsel before evidence is tested to discuss issues. *See id.* at xvi, 52. The Report sets forth several points about which the Court should consult with the parties in devising a plan for the testing of DNA evidence:

- The method of preserving evidence for chain-of-custody purposes during the testing process.
- The type of DNA analysis to be utilized.
- The laboratory that will perform the testing.[14] It might be necessary for the court to enter an order to release evidence to a laboratory for testing.

Prior to any release, both sides should be notified and given an opportunity to be heard.

- Determination of the estimated cost of the testing and who will pay for it. This may be determined by local policy, State statute, agreement between the parties, or court order.[15] In category I cases, the testing will generally be at State expense, but often the petitioner or his family will have to pay, with reimbursement made if there is an exoneration or exclusion.
- Determination of the amount of sample available for testing and replicate testing. If the entire amount of sample will necessarily be consumed, arrangements should be made for a defense or prosecution expert to observe the testing procedures, either by counsel or upon order of the court. The court should try to get the parties or their experts to agree to a protocol to be used. Otherwise, the court may be called upon to determine the protocol to be followed.

*Id.* at 52–53. Instituting these guidelines, both parties could agree an a testing facility so as to diminish the concern about

---

13. The Petition for Writ of Mandamus refers only to a concern that the integrity of the evidence would be compromised, but the Court derives from this that Petitioners share the concerns of the Warden that Cherrix will consume the remaining evidence. (Supp. to Warden's Mot. for Emergency Stay at 2.) The Petition also raises a concern as to the loss of the chain-of-custody for the forensic evidence, but, as is explained herein, this issue is not ripe for review. The Court has merely ordered that funds for DNA testing shall be provided and that the evidence shall be protected from destruction. The Court fully intends to impose procedures to protect the chain of custody when the Court actually orders that the evidence be moved to permit the DNA testing. *Cf. Gall*, 865 F.2d at 789 n. 1 (stating that mandamus petitioner's fears regarding integrity of evidence and chain of custody were "vastly overblown" because petitioner was free to send representative to monitor retesting, and petitioner could argue the vitiating effects of time if retesting produced different results).

14. The Report contains a comprehensive section devoted to the factors to be considered in selecting a laboratory for DNA testing. *See* 1999 REPORT, at 60–63.

15. In compliance with the Court's January 9 Order that Cherrix submit a written budget for the DNA testing, the parties have already submitted the proposed budget and objections. *See generally Cherrix v. Taylor*, No. 00–1377–AM, Proposed Budget for DNA Testing, Proposed Procedures for Safeguarding the Evidence, Schedule of Fees and Credentials for Proposed DNA Laboratory and Schedule of Fees and Credentials for Proposed Phlebotomist (E.D.Va. Jan. 22, 2001); *Cherrix v. Braxton*, No. 00–1377–AM, Warden's Objection to Cherrix's Proposed Budget for DNA Testing and Proposed Procedures for Safeguarding the Evidence (E.D.Va. Feb. 1, 2001); *Cherrix v. Braxton*, No. 00–1377–AM, Reply in Support of Proposed Budget for DNA Testing and Proposed Procedures for Safeguarding the Evidence (E.D.Va. Feb. 5, 2001).

whether all of the forensic evidence is consumed for testing; both parties could rely on the results of a single analysis. In addition, the Warden's concern regarding Cherrix's reference to the possibility of obtaining physical samples from Ms. Van Hart's family would not be an issue. (Supp. to Warden's Mot. for Emergency Stay at 2.) All parties could agree to a qualified laboratory that can test the existing forensic evidence without needing to obtain additional testing material. (Mem. in Support of Pet. Mot for DNA Testing, Ex. 2: Aff. of Dr. William M. Shields ¶ 5.) Cherrix's expert, Dr. William Shields, has sworn that forensic and paternity laboratories can perform accurate STR and Mitochondrial DNA tests on very minute and degraded samples. (*Id.*) In short, Petitioners' concerns regarding the integrity and exhaustion of the evidence are premature and not well founded.

Petitioners assert that the Court has made the Attorney General and the Clerk of the trial court responsible for gathering evidence for Cherrix, and for providing the investigative services referred to in § 848(q)(4)(B). (Pet. for Writ of Mandamus at 10.) The Court has done no such thing. The Court in its January 9, 2001 Order did not order the Attorney General or the Clerk to investigate the case by seeking out materials and documents outside of their custody and control. Nor did the Court order the Attorney General or the Clerk to draw Cherrix's blood. Finally, the Court did not order the Attorney General or the Clerk to have Cherrix's blood or the evidence in their custody analyzed at their expense or in their facilities. If the Court had ordered these things, then the Court arguably would have been making the Attorney General and the Clerk responsible for providing the services described in § 848(q)(4)(B). Instead, what this Court did order was that the Attorney General and the Clerk retain and preserve evidence in their custody and control, so that Cherrix could ultimately review the evidence in preparation of his case.

This Court acted in its January 9 Order precisely and specifically how the Attorney General of the United States has recommended that the Court act. In its 1999 Report, The National Commission on the Future of DNA Evidence recommends that "the court issue an evidence preservation order to the investigating agency, clerk of court, crime laboratory, prosecutor's office, or any other agency in a jurisdiction that may have evidence that might be subject to DNA testing." 1999 REPORT, at 52. Moreover, the Commission states that the court may issue these orders *sua sponte,* and that the evidence protected may include items not used at trial. *Id.* This Court's January 9, 2001 Order provided:

> [I]t is hereby ... ORDERED that Pamela A. Rumpz, in her capacity as the Assistant Attorney General, notify the state government officials who possess evidence pertaining to the murder of Tessa Van, Hart of this pending habeas proceeding and to take steps to preserve all evidence in their care, custody, and control until further order of the Court. Such evidence includes bodily fluids, and other tangible objects in the care, custody, or control of the Commonwealth of Virginia and the Clerk of the Court for the Accomack County Circuit Court. It is further

> \* \* \* \* \* \*

> ORDERED that Pamela A. Rumpz, in her capacity as the Assistant Attorney General of Virginia, and Samuel H. Cooper, Jr., in his capacity as the Clerk of Court for Accomack County Circuit Court, Jr., [sic] *make available* to Petitioner any bodily fluids or swabs seized from Tessa Van Hart, or the Petitioner for testing *to the laboratory as directed by the Court.*

(Jan. 9 Order at 7–8 (emphasis added).) The Court did not order Petitioners to turn over these materials to Cherrix; the Court explicitly held that it granted Cherrix's motion for the preservation of evi-

dence so that Cherrix could have "access" to the evidence:

First, Petitioner's Motion for the Preservation of Evidence is GRANTED because the of evidence is necessary to ensure Petitioner's *access* to evidence.

(*Id.* at 1.) The January 9 Order does not demonstrate any intention that Cherrix or his counsel should take possession of the evidence. (*See id.* at 1, 7–8.) In agreement with the reasoning set forth by the Attorney General's Commission on why the courts should issue preservation orders, this Court issued its January 9 Order "to prevent destruction or disposal of evidence that might be subject to DNA testing." 1999 REPORT, at 52.

In addition, the Court's January 9 Order granted Cherrix's request for funds so that he could independently conduct his own DNA analysis. (Jan. 9 Order at 3–5.) it is clear from the Court's Order that an independent laboratory is to perform the services of analyzing Cherrix's bodily fluid samples, contrary to Petitioners' assertions that the Court makes them responsible for providing Cherrix services in connection with the DNA testing:

[I]t is hereby ... ORDERED that Petitioner's Motion for funds for DNA testing is GRANTED subject to this Court's approval of the following submissions by the Petitioner: (1) a written budget on the proposed laboratory fees and information about the accreditation or credentials of the proposed laboratory; and (2) a written statement of costs for the collection of Petitioner's bodily fluid samples at the prison, and the name, credentials, and fees of the service performing the collection for the Court's approval.

(*Id.* at 7; *see also id.* at 5.) Also clear is that Petitioners are not responsible for the costs of obtaining Cherrix's bodily fluid samples. (*Id.*) Petitioners agree that § 848(q) of Title 21 of the United State Code empowers the Court to grant a motion to disburse funds for reasonably necessary investigative expenses. (Pet. for Writ of Mandamus at 10.) As previously explained, DNA analysis is reasonably necessary to Cherrix's case. *See infra* sections II, III.B.

Upon examination of the Court's January 9 Order, the mandate of the Attorney General of the United States that courts conscientiously examine the need for DNA testing, and the existing law, it is inescapable that the Court had the authority to issue every aspect of its January 9, 2001 Order. The Court is explicitly granted the authority to issue these orders under § 848(q)(9), the Federal Rules of Civil Procedure, and federal case law.

**B. SOURCE OF THE COURT'S AUTHORITY IN 2254 CASES**

The Court did not act solely under § 848(q) in issuing its Order. Petitioners' principal contention in their petition for a writ of mandamus and/or prohibition is that this Court did not have the authority under 21 U.S.C. § 848(q) to compel the Attorney General to locate, preserve, and turn over to Cherrix evidence from his state court criminal trial. (Pet. for Writ of Mandamus at 3.) However, the Court acted pursuant to 848(q)(9) only in finding that Cherrix should receive funding for the investigative services Cherrix seeks to employ. Petitioners take the Court's citation to a statutory reference used in a section of the Court's January 9 Order and argue as if the cited statute is the sole authority upon which the Court relied in issuing its multi-faceted Order. The Court acted pursuant to the power granted by 848(q) only in authorizing funds for Cherrix's DNA testing, and in denying funds for a mental health expert. (Jan. 9 Order at 3–6.) The Court cited federal case law and the Rules of Civil Procedure in exercising its authority to order Petitioners to produce, preserve, and retain evidence. (*Id.* at 1–3) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *United States v. Shipp*, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319 (1906); FED.R.CIV.P. 26(b)(1)). The January 9 Or-

der evidences the Court's recognition of the limited scope of § 848(q) as a funding statute. In ordering the Attorney General and Clerk to preserve and make accessible evidence, the Court acted within the broad authority of federal law. (*Id.* at 2–7 (citing statutory law of § 848(q), federal cases, and the Federal Rules of Civil Procedure)).

Petitioners fail to recognize the discretion of a district court under the Federal Rules of Civil Procedure, and the requirements imposed on a district court under federal law. Section 948(q) sets forth the strictures of only some procedures governing federal habeas corpus cases. There are also general federal rules and guidelines that govern § 2254 cases. *See* 28 U.S.C. § 2254(f); 28 U.S.C.A. § 2254 and Annotations; FED.R.CIV.P. 81(a)(2); RULES GOVERNING § 2254 CASES, Rule 6(a). This Court acknowledged in its January 9, 2001 Order that it could apply the Federal Rules of Civil Procedure in this § 2254 habeas corpus case. (Jan. 9 Order at 2 n. 1. ("The Federal Rules of Civil Procedure may be applied to petitions filed under section 2254.")) The Federal Rules of Civil Procedure govern the majority of issues that arise in a petitioner's development of his habeas case.

### 1. The Court's Authority Under the Federal Rules of Civil Procedure

▮▮▮ Rule 6(a) of the Rules Governing Section 2254 Cases states that "a party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure" if good cause is shown and the judge, in the exercise of his discretion, grants the party leave to do so. RULES GOVERNING § 2254 CASES, Rule 6(a); *see also* FED.R.CIV.P. 81(a)(2) (stating that the Federal Rules of Civil Procedure apply to proceedings for habeas corpus); *Jenkins*, 1992 WL 32342, at *1 (stating that, under Rule 6, the discovery devices available under the Federal Rules of Civil Procedure may be utilized in § 2254 cases). Good cause for discovery under Rule 6(a) is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is[ ] entitled to relief." *Bracy*, 520 U.S. at 908–09, 117 S.Ct. 1793 (quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)); *see also Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir.1998) (same). Where, as here, there are claims of constitutional error, there has been an advancement in DNA technology that could demonstrate a viable claim of actual innocence, and the habeas petitioner faces execution, the Court acted within its discretion in finding that good cause was shown to make limited processes of discovery available to Cherrix. *See Bracy*, 520 U.S. at 909, 117 S.Ct. 1793 (stating that it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry); compare *Jenkins*, 1992 WL 32342, at *1 (finding that the habeas petitioner had shown good cause to use discovery devices of the Federal Rules because the DNA fingerprinting tests petitioner sought to utilize were unavailable at the time of his trial); *Gaitan–Campanioni v. Thornburgh*, 777 F.Supp. 1355, 1356 (E.D.Tex.1991) (holding that although discovery is permitted in habeas cases only by leave of court, court should nor hesitate to allow discovery where it will help illuminate issues underlying applicant's claim).

Petitioners argue that Cherrix should not be granted access to the general avenues of discovery because Cherrix did not seek DNA testing in his trial in state court. (Pet. for Writ of Mandamus at 6.) In 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended the statute governing habeas cases to alter the discovery allowable in habeas corpus proceedings. *See* 28 U.S.C.A. §§ 2254(20(A)(ii), (2)(B)), Pub.L. No. 104–132, 110 Stat. 1214 (1996), *cited in Charles v. Baldwin*, 1999 WL 694716, *1 (D.Or. Aug. 2, 1999). AEDPA precludes a court from considering new facts presented for the first time in a federal habeas

proceeding unless the court has decided that a petitioner is entitled no an evidentiary hearing. *See id.* If the petitioner is not entitled to a hearing, then "good cause" is not shown, and the full ambit of discovery is not available to a habeas petitioner. Yet, there are two exceptions to the AEDPA's limitation on a habeas petitioner's access to discovery. First, if the claim involving previously unpresented facts relies on a new rule of constitutional law, then AEDPA does not limit the scope of discovery. *See Charles,* 1999 WL 694716, at *1–2 (explaining the operation of AEDPA and citing subsection (2)(A)(i)). Cherrix's claims of ineffective assistance of counsel and actual innocence do not implicate this exception. The second exception to AEDPA's limitation applies in this case:

(A) the claim relies on . . .

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* at *2 (quoting AEDPA).

Good cause is shown that Cherrix is entitled to utilize limited discovery because Cherrix could not have presented to the trial court the evidence he now seeks, and because upon this evidence a jury would not find Cherrix guilty. As explained above, the Commonwealth admitted DNA evidence in Cherrix's state trial. However, the DNA testing on the seminal fluid was partially inconclusive. Cherrix could not have previously discovered through the exercise of due diligence the quality of DNA test results he now seeks because DNA technology had not advanced to the level of accuracy and precision it has now achieved.

Furthermore, based on the results that Cherrix expects from the DNA tests, it is arguable that no reasonable jury would find him guilty of the sodomy and murder of Ms. Van Hart. As previously noted, it has not been alleged that more than one perpetrator committed the sodomy and murder of Ms. Van Hart. *See infra* section III, IV. Also, the Commonwealth contends that the inability to amplify the spermatozoa in the seminal fluid recovered from Ms. Van Hart indicates that the assailant may have worn a condom. If Cherrix's requested DNA analysis reveals the presence of sperm-yielding DNA that does not match Cherrix's DNA, then the Commonwealth's theory of the case is discredited. *See Hunt,* 205 F.3d 1333, 2000 WL 219755, at *3. This Circuit in *Hunt* noted that, in several cases, when it is has been attested that only one perpetrator committed a sexual assault, evidence that the defendant was not the contributor of the DNA established "the requisite probability that a reasonable jury would not have returned a guilty verdict against that defendant." *Id.* If a jury believes that Cherrix did not contribute the semen at the scene, the jury could find that Cherrix did not commit the sodomy or the murder. At the same time, if spermatozoa is detected through DNA analysis, this calls into question the Commonwealth's theory of the case that the assailant wore a condom. A jury could find that this discredits the Commonwealth's case, and therefore find Cherrix not guilty. Thus, because Cherrix could not have "previously discovered evidence through the exercise of due diligence" and, by considering the new evidence, "no reasonable factfinder would have found [him] guilty of the underlying offense," Cherrix satisfies the exception to AEDPA and is entitled to a range of discovery tools. *Charles,* 1999 WL 694716, at *2 (quoting AEDPA).

◼◼◼ The Attorney General for the Commonwealth of Virginia and the Clerk of the Accomack County Circuit Court argue in the Petition that this Court acted outside of its authority in ordering Petitioners to undertake specific tasks in conjunction with Cherrix's request for DNA testing because both the Attorney General

and the Clerk of the trial court are "non-parties to the underlying habeas action." (Pet. for Writ of Mandamus at 9.) However, Petitioners have resorted to an argument based on the literal interpretation of the labeling of a habeas case. Wardens of correctional facilities are almost without exception the named respondents in § 2254 habeas petitions. *See, e.g., Quesinberry,* 162 F.3d 273; *Bracy,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97; *Jenkins,* 1992 WL 32342; *Esposito v. Manson,* 65 F.R.D. 658 (D.Conn.1975). However, it is evident that wardens do not generally play a role in the proceedings which result in the confinement of habeas petitioners. Therefore, wardens are not responsible for the alleged unconstitutionality of which petitioners are complaining, and wardens do not have possession or control over the records or evidence utilized in the offending trial proceeding. *See Harris v. Nelson,* 394 U.S. 286, 296, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (noting the non-existent role of wardens in trial proceedings). For these reasons, even before Rule 6(a) of the Rules Governing § 2254 Habeas Cases made the discovery rules of the general Federal Rules of Civil Procedure available to § 2254 petitioners, the Supreme Court noted that the Federal Rules were "ill-suited to the special problems and character of [habeas] proceedings." *Id.; see also* RULES GOVERNING § 2254 CASES, Rule 6(a), Advisory Committee Notes (indicating that Rule 6 was adopted in 1976). As an example, the Supreme Court noted that Rule 33 provides for written interrogatories to be served by a party upon any adverse party. *See Harris,* 394 U.S. at 296, 89 S.Ct. 1082; FED.R.CIV.P. 33. The *Harris* court noted that this would mean that a prisoner's interrogatories would be served upon the warden, although the warden would be unable to answer from personal knowledge any questions relating to the petitioner's arrest and trial. *See Harris,* 394 U.S. at 296, 89 S.Ct. 1082. The *Harris* court noted that a literal application of the Federal Rules would invoke a circuitous and burdensome procedure of requiring wardens to solicit answers from the appropriate officials and then replying "under oath." *See id.*

To address the dearth in rules applicable to habeas cases, the Supreme Court promulgated, and Congress adopted, the Rules Governing § 2254 Cases. *See Bracy,* 520 U.S. at 904, 117 S.Ct. 1793 (stating that habeas rules were promulgated as a result of *Harris v. Nelson* ). Now that the Federal Rules are applicable to federal habeas cases, the courts must employ them under the Supreme Court's mandate that district courts "arrange for procedures that will allow development ... of the facts relevant to disposition of a habeas corpus petition." *Harris,* 394 U.S. at 298, 89 S.Ct. 1082. The *Harris* Court instructed that, in reviewing habeas cases, district courts should fashion appropriate modes of procedure analogous to existing rules and in conformity with judicial usage. *See id.* Accordingly, the proper individuals to whom this Court should look to provide the information Cherrix needs to develop his habeas petition are the Attorney General and the Clerk of the trial court, who are the equivalents to "parties" to this suit under the common notions of who constitutes a party for discovery purposes.

Rule 34 of the Federal Rules of Civil Procedure states that a party may request that another party produce documents and tangible things for testing. *See* FED.R.CIV.P. 34(a). Because the evidence that Cherrix seeks to perform DNA analysis upon is in the custody or control of Petitioners, this Court acted within its authority to order Petitioners to retain the evidence so that it may be produced to Cherrix for testing. *See id.* Furthermore, even if Petitioners are not viewed as equivalent to parties in Cherrix's action, Rule 34(c) permits the Court to compel non-parties to produce documents and "things." *See* FED.R.CIV.P. 34(c). Rule 35(a) of the Federal Rules of Civil Procedure grants the Court the authority to order DNA testing of Cherrix's bodily

fluids in support of the Petition for Habeas Corpus. *See* FED.R.CIV.P. 35(a); *see, e.g., Dechaine v. Warden, Maine State Prison,* 2000 WL 1183165, *17 (D.Me. July 28, 2000) (stating that Rule 35 is implicated in a request that saliva be submitted for DNA testing).

### 2. The Court's Authority to Order State Officials to Act

Federal case law demonstrates that, notwithstanding Petitioners' status as "nonparties," the Court had the authority to order Petitioners to retain and make accessible evidence in their custody pursuant to the Court's authority to provide a habeas corpus petitioner with access to avenues of discovery. Similar to the instant case, the habeas petitioner in *Bracy v. Gramley* sought materials that were not in the custody or control of the respondent. 520 U.S. at 902, 117 S.Ct. 1793. Bracy alleged as the basis of his habeas petition that the federal judge who had tried Bracy's case was corrupt, and that Judge Thomas J. Maloney convicted Bracy to deflect attention away from the judge's extortion and racketeering practices. *See id.* at 901, 117 S.Ct. 1793. An Illinois district court ultimately convicted Maloney of conspiracy, racketeering, extortion, and obstructing justice. *See id.* at 902, 117 S.Ct. 1793. Bracy sought discovery of the materials from Maloney's trial: the sealed transcript from the trial, reasonable access to the prosecution's materials, the opportunity to depose persons associated with Maloney, and a chance to search Maloney's rulings for a pattern of pro-prosecution bias. *See id.* As in this case, the warden was the respondent in *Bracy,* yet Bracy sought materials that were in the custody or control of other parties. The Supreme Court held that Bracy was entitled to the requested discovery. *See id.* at 908–09, 117 S.Ct. 1793. Similarly, Cherrix is entitled to discovery here. Although Warden Daniel A. Braxton is the named respondent in this case, this Court has the authority to hold that materials in the custody or control of the Attorney General or the Clerk

should be made available to Cherrix. *See id.* at 908–09, 117 S.Ct. 1793.

Although the parties that were required to give petitioner access to materials were federal officials in *Bracy,* a federal district court also has the authority to order state officials to turn over documents and evidence. Petitioners in their petition for writ of mandamus cite *Jackson v. Vasquez* for the proposition than § 848(q) does nor empower a district court to compel action from a state official. 1 F.3d 885, 888 (9th Cir.1993). However, as explained in Cherrix's Opposition to the Application for Emergency Stay, *Jackson* was limited to its facts: (1) the district court's order had been issued *ex parte,* and (2) the order was issued prior to the filing of a federal habeas petition. (Opp'n to Application for Emergency Stay at 13–14.) The *Jackson* court explicitly stated that it was nor ruling on whether a district court is empowered ·to issue an order compelling a state official to act. *See Jackson,* 1 F.3d at 889. Furthermore, in arguing that this Court acted improperly under § 848(q) in ordering the Attorney General and the Clerk to retain and produce evidence, Petitioners disregard the fact that the Court is granted the authority to order Petitioners to retain and make accessible evidence via other statutes and federal case law.

The Supreme Court has held for many years that a federal district court sitting in habeas corpus has the power to compel production of complete state records. *See Townsend v. Sain,* 372 U.S. 293, 319, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *superseded by statute on other grounds (see Joyner v. King,* 786 F.2d 1317, 1321, 1322 (5th Cir. 1986) (stating that § 2254 was amended to codify the ruling in *Townsend* regarding granting of evidentiary hearings in habeas cases)), *also overruled on other grounds* (concerning when an evidentiary hearing is mandatory in a habeas case). Moreover, such power is implicit in 28 U.S.C. § 2254(f). *See* 28 U.S.C. § 2254(f). Section 2254(f) provides that the official rec-

ords of the state court, "duly certified by the clerk of such court," shall be admissible in the federal court habeas proceeding. *See id.* Therefore, if the federal court seeks to review the state court's records, the federal court would have the authority to compel the state court, and the clerk of the court specifically, to provide those records. Thus, this Court has the statutory authority to order the Attorney General and the Clerk of the trial court to produce evidence collected in connection with state court proceedings.

The cases of *In re Warden, Kentucky State Penitentiary v. Gall,* 865 F.2d 786, *Toney v. Gammon,* 79 F.3d 693, *Tyler v. Purkett,* No. 00–1432–WMKC (8th Cir. June 21, 2000) (en banc), and *Jenkins v. Scully,* 1992 WL 32342, are also instructive on the Court's authority. *Gall* is a case very similar to this one in several respects. Like the instant case, the Court of Appeals in *Gall* was called upon to consider a writ of mandamus. *See Gall,* 865 F.2d at 786. Like Cherrix, Gall was sentenced to death and Gall's execution was stayed just short of his execution, pending the resolution of a petition for habeas corpus. *See id.* at 787. In conjunction with Gall's habeas petition, the district court granted Gall's motion that the warden provide the entire trial record and its accompanying exhibits. See id. To accompany the record, the court also ordered that the Kentucky State Police Crime Lab provide Gall with hair samples and dry-mount microscope slides for "examination by petitioner's experts, with appropriate safeguards." *Id.* Notably, the testing ordered by the district court in *Gall* was a retesting of evidence previously tested by the state for the trial. This is yet another similarity to the instant case.

The warden in *Gall* petitioned the Sixth Circuit to rescind the order providing Gall with physical evidence for retesting. *See id.* The Sixth Circuit held that the district court had not abused its discretion in ordering the provision of physical evidence to the habeas petitioner for laboratory analysis. *See id.* at 788–89. The Sixth Circuit so held, even though the provision of evidence in *Gall* entailed the removal of evidence from Kentucky to Texas. *See id.* at 788. Cherrix requests the provision of evidence that is in the custody of individuals in this state, and the parties may select a qualified laboratory outside of this state to conduct the requested DNA testing. The breadth of the discretion granted the district court in *Gall* illustrates that this Court did not exceed its discretion in ordering Petitioners to retain and provide the evidence Cherrix has requested.

In another court of appeals case sharing similarities with this case, the Eight Circuit held that a habeas petitioner was entitled to discovery of a state's evidence to conduct scientific testing. *See Toney,* 79 F.3d at 693. In *Toney,* habeas petitioner Toney had been convicted of rape and sodomy. Toney claimed ineffective assistance of counsel and raised constitutional claims before the district court on habeas review. *See id.* at 696. Toney maintained his innocence, and argued that his counsel had been ineffective in failing to have the semen of the assailant blood-typed, which he claims would have excluded him as a suspect. *See id.* at 697. Given the dissimilarities between the witnesses' description of the assailant and Toney's physical characteristics, Toney argued that his counsel should have developed a defense of mistaken identity. The Eighth Circuit concluded that, given the nature of Toney's allegations, he had shown good cause for discovery under Rule 6. *See id.* at 700 (finding that it had been an abuse of discretion to deny Toney discovery). The court held that discovery for Toney was "indispensable to a fair, rounded, development of the material facts." *Id.* Similarly, this Court has found that the outcome of a DNA test could exclude Cherrix as a suspect. Therefore, Cherrix demonstrated good cause for discovery of evidence held by state officials under Rule 6. *See* Rules Governing § 2254 Cases, Rule 6(a).

In addressing Toney's attempts to develop his habeas case, Toney asserted that the DNA and other scientific testing that he requested could exclude him as a suspect and were not available at the time of trial. *See Toney*, 79 F.3d at 700. Toney further asserted than he had not been able to obtain samples from the State in order to perform any kind of testing: blood-typing or DNA fingerprinting. *See id.* The State acknowledged that the exhibits from Toney's criminal trial remained in the custody of the County authorities, but the State refused the court's request to voluntarily make the exhibits available to Toney's counsel. See id. The Eighth Circuit held that Toney was *"entitled* no have *access* to [the] evidence through *discovery." Id.* (emphasis added). The Eighth Circuit remanded so that the district court could grant discovery and order the state to give Toney access to the forensic evidence. *See id.* at 700–01. The parallels between the Eighth Circuit's holding and this Court's January 9 Order *ratify the* authority this Court exercised in its January 9 Order. Like the *Toney* court, this Court recognized the need to order the state to preserve evidence so that Cherrix could be granted *"access* to evidence." (Jan. 9 Order an 1 (emphasis added); *see also id.* at 3 (ordering evidence protection to preserve Cherrix's right to "seek access to forensic evidence").) Furthermore, this Court, like the *Toney* court, acted pursuant to its power to grant discovery, not pursuant to § 848(q). (Id. at 2.)

*Jenkins v. Scully* provides further support that this Court acted within its authority in ordering the Attorney General and the Clerk to provide Cherrix with evidence for DNA testing. 1992 WL 32342. *Jenkins* involved a § 2254 habeas petitioner's motion that the court direct the county district attorney to produce hair samples so that they could be subjected to DNA fingerprinting tests at an appropriate facility. *See id.* at *1. The District Court for the Western District of New York held that the habeas petitioner was entitled to the opportunity to resort to the DNA tests. *See id.* The *Jenkins* court found that "tangible things [could] be subpoenaed from a non-party for inspection and testing" pursuant to Rules 34(c) and 45, and the court's discretion. *Id.* at *2 (citing 28 U.S.C. § 2254; Fed.R.Civ.P. 34(c), 45).

Another case, *Tyler v. Purkett,* involved an appeal, not a habeas. No. 00–1432–WMKC (8th Cir. June 23, 2000). Nevertheless, *Tyler* demonstrates that district courts are given wide authority to order parties to act so as to uphold a defendant's constitutional rights. Defendant-Appellant Tyler moved the appellate court to compel the State to produce any existing semen and hair samples for DNA testing. The Eighth Circuit, sitting en banc, ordered the district court "to take such action" as would ensure that the DNA testing of any existing samples would be conducted. *Tyler,* No. 00–1432–WMKC. The Eighth Circuit did not indicate any limitation on the district court's powers to ensure DNA testing of evidence in the custody or control of state officials.

Further evidence that it is firmly established that federal district courts have the authority to order state officials to produce documents and evidence is found in orders issued by other judicial officers of the Eastern District of Virginia. Less than two months preceding the date of this Opinion, Judge James C. Cacheris ordered the Clerk of the Circuit Court of Loudon County, Virginia to produce the official court record of a habeas petitioner's state court proceedings. *See Hervin v. Angelone,* No. 00–1630–A (E.D.Va. Jan. 24, 2001). Judge Cacheris sought the state court records to determine the viability of the arguments raised in Herbin's habeas corpus petition. Also, in September of last year, Judge Albert V. Bryan, Jr. held that a convicted defendant stated a claim for violations of his constitutional rights in arguing that the Commonwealth Attorney for Fairfax County, Virginia should have searched for and provided the defendant

with evidence for DNA testing. *See Harvey v. Horan,* 119 F.Supp.2d 581 (E.D.Va. 2000). Although not a habeas case, the convicted defendant in *Harvey* raised in his 42 U.S.C. § 1983 action claims very similar to those raised in this and other habeas corpus actions. Judge Bryan noted the similarities; Harvey's claim was distinguishable from a habeas corpus petition only because: (1) Harvey did not necessarily seek to invalidate his conviction, and (2) Harvey did not seek immediate or more speedy release from prison. *See Harvey,* 119 F.Supp.2d at 583–84. Harvey based his § 1983 action on the contention that the Commonwealth Attorney's refusal to locate and provide two swab samples, and the mouth, vaginal, and thigh smears from his rape case deprived Harvey of the ability to prove his innocence for a pardon board or a clemency proceeding. *See id.* at 582. Analogously, Cherrix argues that DNA tests could prove his innocence for a habeas corpus proceeding. Moreover, as in *Harvey,* the information Cherrix seeks for DNA testing is in the possession or control of state officials.

*Harvey* also provides support for another aspect of this Court's January 9 Order: the instruction that the Attorney General take steps to preserve evidence in the care, custody, and control of state government officials. (Jan. 9 Order at 7.) The fact that Harvey legitimately claimed violation of his constitutional rights based on the Commonwealth Attorney's inability, or unwillingness, to locate evidence for Harvey no analyze illustrates the authority of the federal court to order state officials to retain and preserve evidence.

### 3. The Court's Authority to Order the Retention of Evidence

This Court had a well-founded concern motivating it to order the Attorney General to ensure the preservation of evidence in this case. In support of his Motion for the Retention and Preservation of Evidence, Cherrix presented evidence to this Court that some state or local officials have re-

tention policies that allow them to destroy evidence. (Supp. to Pet.'s Mot. for Retention and Preservation of Evid., Ex. 3: *Smith v. Murray,* No. 3:93CV710 (E.D.Va., Richmond Division), Resp't Answer to Pl.'s Interrog.) Dr. Frances P. Field, Assistant Chief Medical Examiner for the Commonwealth of Virginia, has sworn that tissue samples in his custody "were routinely destroyed" pursuant to his office's regular policy. (*Id.*) Dr. Field further stated that it was the Commonwealth Attorney, or one of his assistants, who called to authorize the destruction of the evidence. (*Id.* at Ex. 2: *Smith v. Murray,* No. 3:93CV710 (E.D.Va., Richmond Division), Resp't Supp. Answers to Pet.'s Interrogs.) Upon consideration of this information, this Court requested than the Attorney General agree to retain the evidence pertinent to this case and direct others not to destroy it. The Attorney General stated that she could not assure the Court that state agencies would not destroy the evidence. *See Cherrix v. Taylor,* Transcript of Telephonic Conference on Motion for DNA Testing and Motion for Retention and Preservation of Evidence, No. 00–1377–AM (E.D.Va. Dec. 20, 2000). This Court acted in its January 9 Order to ensure that what occurred in *Smith v. Murray* would not occur here. The Court acted to ensure that habeas petitioner Cherrix would have access to evidence to develop his case.

Notwithstanding the Commonwealth's history of destroying evidence, Petitioners argue that the Court did not have the authority to order Petitioners to preserve evidence held by state officials. (Pet. for Writ of Mandamus at 10–11.) Federal law discredits Petitioners' argument. In the United States Supreme Court case *Arizona v. Youngblood,* a defendant argued post-conviction that the police's failure to preserve physical evidence violated his Due Process rights under the Fourteenth Amendment. 488 U.S. at 52, 109 S.Ct. 333. Youngblood argued that the police's failure to refrigerate the victim's clothing, and to have a physician examine samples

close to the time the samples were taken, denied him evidence material to his defense. *See id.* at 54, 109 S.Ct. 333. The *Youngblood* Court considered "what might loosely be called the area of constitutionally guaranteed access no evidence." *Id.* The Supreme Court concluded that one's Due Process rights are violated if evidence is destroyed and the officials in possession of that evidence knew of the potentially exculpatory value of the evidence.[16] *See id.* at 56, 58, 109 S.Ct. 333. Here, Petitioners are aware of Cherrix's assertion that the evidence held by state officials is exculpatory. Therefore, once good cause was shown for discovery, it was appropriate for the Court to protect Cherrix's right to access the evidence. *See* RULES GOVERNING § 2254 CASES, Rule 6(a) (permitting habeas petitioners use of Federal Rules of Civil Procedure within discretion of court and for good cause shown); FED.R.CIV.P. 26(b)(1) (permitting discovery regarding the existence, description, and nature of tangible things); FED.R.CIV.P. 34(a) (permitting discovery of documents and things, and the copying, testing, or sampling of tangible things).

The United States Supreme Court has held that it is not error, and, in fact, is appropriate for a federal court to order a state official to retain, preserve, or protect tangible things. *See United States v. Shipp,* 203 U.S. at 573, 27 S.Ct. 165 ("*Shipp I*"); *United States v. Shipp,* 214 U.S. 386, 410, 29 S.Ct. 637, 53 L.Ed. 1041 (1909) ("*Shipp II*"). The *Shipp* case involved a charge of contempt of court lodged against a Tennessee county sheriff. The sheriff failed to protect and preserve a "body" in contravention of federal court orders. The Supreme Court held that the federal courts had the authority to issue the retention orders, and that the sheriff was guilty of contempt. *See Shipp II,* 214 U.S. at 423, 425, 29 S.Ct. 637 (holding Sheriff Shipp in contempt for aiding and abetting a mob in killing a prisoner ordered into Shipp's protective care).

In the *Shipp* case, a black man, Mr. Ed Johnson, had been convicted of the rape of a white woman. *See Shipp I,* 203 U.S. at 571, 27 S.Ct. 165. Johnson filed a petition for a writ of habeas corpus to the United States circuit court. *See id.* The circuit court denied the writ, but remanded Johnson to Hamilton County for ten days no enable Johnson to bring an appeal. Upon appeal of this directive, the Supreme Court of the United States issued a similar order for Johnson's detention, and further ordered the sheriff to retain custody of Johnson pending the appeal. *See id.* There was a great deal of public outrage in the area an the rape of a white woman by a black man, and the sheriff was informed that a mob would attempt to murder the prisoner. *See id.* at 572, 27 S.Ct. 165. A mob had already attempted to remove Johnson from the jail on the night Johnson was arrested for the rape. *See Shipp II,* 214 U.S. at 415, 29 S.Ct. 637. In ordering the sheriff to retain Johnson, the Court was ordering the sheriff to protect Johnson from harm. *See id.* at 420, 29 S.Ct. 637 (finding that Shipp defied the court's order by failing to prepare for the mob, making it easy for the mob to lynch Johnson, and by failing to "help in the slightest degree to protect Johnson"). Like in the Cherrix case, the individual in Shipp to whom the Supreme Court issued the preservation order was not a named "party" to the case.

This Court acted under the same authority in its January 9 Order as that articulated in *Shipp. See Shipp I,* 203 U.S. at 573, 27 S.Ct. 165; *Shipp II,* 214 U.S. at 419–20, 29 S.Ct. 637. The Supreme Court held in *Shipp I* that a federal court "[has] the authority, from the necessity of the case, to make orders to preserve the existing conditions and the sub-

---

16. The *Youngblood* Court ultimately held that Youngblood had not demonstrated that the state police knew of the exculpatory value of the evidence when they failed to preserve the evidence. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. 333. The Court held, therefore, that there had been no violation of Youngblood's Due Process rights. *See Id.*

ject of [a habeas] petition" until the federal court can rule on issues regarding the petition. *See Shipp I,* 203 U.S. at 573, 27 S.Ct. 165 (stating that court could act to preserve conditions until judgment on jurisdiction could be announced). The Court noted in *Shipp I* that an order issued by a court having no jurisdiction to issue the order may be disregarded without liability. *See id.* (citations omitted). The Supreme Court held that the sheriff could be held in contempt of court because the federal court *did* have the authority to order the sheriff to retain and protect the body of Johnson. *See id.* Analogously, this Court had the authority to order the Attorney General for the Commonwealth to ensure the preservation of the forensic evidence in this case so as "to preserve the existing conditions and the subject of [Cherrix's] petition." *Id.*

Furthermore, this Court had the authority to issue a preservation order, regardless of whether ultimately the DNA nesting is inconclusive, or the Court determines that Cherrix's petition does not have merit. *See id.* The *Shipp I* Court stated that there is no exception to the court's authority to preserve existing conditions if the final judgment is that the writ of habeas corpus should not have issued or that the appeal should be dismissed. *See id.*

This Circuit has accepted a district court's authority to enter a preservation order. In the products liability case of *Cole v. Keller Industries, Inc.,* District Judge James R. Spencer issued a "non-destruct" order to prevent further destruction of evidence. 872 F.Supp. 1470, 1472 (E.D.Va.1994). Judge Spencer ultimately granted a motion by defendant for summary judgment, grounded, in part, on spoilation of evidence. Judge Spencer held that "preservation of the allegedly defective product is of 'utmost importance' in defending against a product liability suit." *Id.* at 1473. Spencer held that the failure to preserve the evidence prejudiced the defendant. *See id.* The Fourth Circuit

reversed Judge Spencer's grant of summary judgment, holding that, absent a showing of bad faith, dismissal on the grounds of spoilation of evidence was not authorized. *See Cole v. Keller Industries, Inc.,* 132 F.3d 1044, 1047 (4th Cir.1998) (citing *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 155–57 (4th Cir.1995); *Berthold–Jennings Lumber Co. v. St. Louis, I.M. S. R. Co.,* 80 F.2d 32, 41–42 (8th Cir.1935); *Gentry v. Toyota Motor Corp.,* 252 Va. 30, 471 S.E.2d 485 (1996)). However, in its careful and thorough analysis of the law and the district court proceedings, the Fourth Circuit did not hold that Judge Spencer acted outside of his authority to issue an order to prevent the further destruction of evidence. *See generally id.*

District court cases outside of this Circuit also illustrate the Court's authority to order the preservation of evidence. In *Perry v. Saint Francis Hospital and Medical Center,* the Kansas district court enjoined the American National Red Cross from distributing or destroying bone tissue processed from the bones of a decedent. 1994 WL 191913 (D.Kan. April 20, 1994). The plaintiffs in *Perry* were the decedent's wife and children, and they wished to prevent the Red Cross from distributing the bone tissue to individuals awaiting bone marrow donations. *See id.; Perry v. Saint Francis Hosp. and Med. Ctr.,* 865 F.Supp. 724, 724–25 (D.Kan.1994). Plaintiffs argued that the bone matter would be evidence at trial, and that they would ask that the bone matter be returned if they prevailed. Similarly, in the Louisiana case of *Andrew Martin Marine Corp. v. Stork–Werkspoor Diesel B.V.,* the defendant sought a protective order to prevent plaintiff's destruction of evidence through metallurgical tests. 480 F.Supp. 1270, 1280 (E.D.La.1979) (making reference to the defendant's motion). The district court granted the order. *See id.* (referencing the success of defendant's motion). Like the courts' orders in *Perry* and *Andrew Martin Marine* which were issued to enable the moving parties to have evidence

available for trial, this Court ordered the Attorney General to ensure the preservation of the evidence in this case so Cherrix could use the evidence in conjunction with his habeas petition. Notably, both *Perry* and *Andrew Martin Marine Corp.* involved preservation orders issued to parties in civil actions. Nevertheless, these cases demonstrate the Court's power to issue orders to prevent the destruction of pertinent evidence.

## C. Overlap of State and Federal Realms

 Petitioners argue that this Court has overstepped its bounds in ordering state officials to preserve evidence and by granting Cherrix access to evidence. (Pet. for Writ of Mandamus at 14.) Petitioners argue that a federal court should not defeat the interests of finality and invade a state's "sovereign power to enforce the criminal law" through federal habeas review. (*Id.* (citations omitted).) Petitioners' argument that this Court has improperly invaded the realm of the Commonwealth ignores the fact that the provision of federal habeas review is premised on the notion that the federal court will venture into the state's realm, to determine whether there has been a violation of a habeas petitioner's constitutional rights. *See Jackson v. Virginia*, 443 U.S. 307, 322–23, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The sovereignty and independence of the state realm should be respected. However, the finality of an action taken in the state realm is not to be protected to the exclusion of the vindication of one's constitutional rights, especially when the penalty is death.

 The United States Supreme Court has noted that "the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation." *Id.* at 322, 99 S.Ct. 2781. However, federal courts step in where state courts can no longer provide a remedy. *See id.* State appellate review serves in the vast majority of cases to vindicate failures in due process protection, but it is the occasional lapse of the state court that the federal writ of habeas corpus stands ready to correct. *See id.* (citing *Brown v. Allen*, 344 U.S. 443, 498–501, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.)).

Like Petitioners in this case, the respondents in *Jackson v. Virginia* argued that the federal court should be foreclosed from further inquiry into aspects of a habeas petitioner's case if the petitioner, convicted in a state court, has been given a "full and fair hearing" in the state system. The Supreme Court in Jackson acknowledged that any judgment by a state court affirming a criminal conviction is entitled to deference by the federal courts. *See id.* at 323, 99 S.Ct. 2781. However, the Jackson Court pointed out that "Congress in § 2254 selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law." *Id.* The federal habeas corpus statute presumes the norm of a fair trial in state court, but does not presume that the state proceedings will always be without error. *See id.* Although the notion of "finality" is important, such finality is not desirable when the result is the "finality" of the deprivation of liberty at the expense of a constitutional right. *See id.* Therefore, this Court, by statute, has the duty to examine actions taken by the Commonwealth to make sure that the final result obtained is one in keeping with Cherrix's constitutional rights.

The observations of the Supreme Court in *Jackson* and the Supreme Court's own orders demonstrate that the sovereignty of the Commonwealth is not absolute. As noted above in the description of the *Shipp* case, the Supreme Court itself has issued orders directed at state officials in order "to preserve the existing conditions and the subject of [habeas petitions]." *Shipp I*, 203 U.S. at 573, 27 S.Ct. 165. In *Shipp*, the Supreme Court ordered a county sheriff to retain and protect the body of John-

son, a habeas petitioner and appellant. When the sheriff disregarded the Court's order, the Supreme Court held the sheriff in contempt of court. *See Shipp II*, 214 U.S. at 420–21, 425, 29 S.Ct. 637.

In the mandates of its January 9, 2001 Order, this Court exercised the responsibility that Congress has entrusted to the federal courts to "determin[e] whether state convictions have been secured in accord with federal constitutional law." *See Jackson*, 443 U.S. at 323, 99 S.Ct. 2781. The importance of the federal writ of habeas corpus is highlighted in the plain text of the United States Constitution: "The privilege of the writ of habeas corpus shall not be suspended;" therefore, the federal courts must act appropriately to sustain the integrity of the writ. *See* U.S. CONST. art. I, § 9, cl. 2. Accordingly, where a state's proceedings fail to uphold individuals' constitutional rights, it is appropriate for the federal system to act to safeguard these rights. *See* U.S. CONST. art III. § 2 ("The judicial power shall extend to all cases, in law and equity, arising under this Constitution [and] the laws of the United States....").

**D. Inappropriateness of Mandamus Relief**

Although this Court has dedicated substantial space to provide clarification of its January 9, 2001 Order, it is important to note that the Warden, Attorney General, and Clerk's Petition is not properly before the Fourth Circuit. Neither mandamus nor prohibitive relief are appropriate in this case. Courts should resort to the remedy of a writ of mandamus or prohibition only in extraordinary circumstances. *See Gall*, 865 F.2d at 788 (stating that courts should "hardly ever!" use mandamus). "Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). Congress intended that appellate review of a district court's order should be postponed until after the court has ren-

dered its final judgment. *See id.* (citations omitted). In order to ensure that the writ will issue only in extraordinary circumstances, the Supreme Court has required that the party seeking the writ demonstrate two things: (1) that it has exhausted its other means to achieve the remedy it desires, and (2) that the party's right to the writ is "clear and indisputable." *See id.; see also McDaniel v. United States District Court for the District of Nevada*, 127 F.3d 886, 888 (9th Cir.1997). The Petitioners' request for a writ is not appropriate here because they have not sought other means, such as direct appeal, to attain the relief they desire, and they have not demonstrated that they have a clear right to the issuance of the writ. *See id.*

It is clear from the face of Petitioners' Petition that they did nor seek alternative remedies before seeking their writ. The Petition is entitled "Petition for a Writ of Mandamus and/or Prohibition *and Appeal from Order Granting Injunction*." (Pet. for Writ of Mandamus (emphasis added).) Petitioners have submitted their appeal in combination with their petition for a writ of mandamus or prohibition. Therefore, it is clear that Petitioners did not first seek to appeal this Court's January 9, 2001 Order. Consequently, the issuance of a writ of mandamus and/or prohibition is not appropriate an this time.

Furthermore, Petitioners cannot demonstrate that they have a clear and indisputable right to the issuance of a writ. *See Allied Chemical Corp.*, 449 U.S. at 35, 101 S.Ct. 188; *Gall*, 865 F.2d at 788–89. First, this Court did not clearly err as a matter of law in ordering the disbursal of funds for DNA testing and ordering that Petitioners retain the forensic evidence to provide Cherrix the opportunity to access the evidence. *See infra* section V.B. As has been demonstrated in detail, this Court possesses the authority to order the disbursal of funds for Cherrix's requested DNA testing under 21 U.S.C. § 848(q), and the authority to provide for Cherrix's access to the existing physical evidence under the rules and law governing discov-

ery. Where, as here, a court acts well within its discretion in ordering discovery, there is no clear error as a matter of law. *See McDaniel,* 127 F.3d at 888 (holding that the district court did not err as a matter of law in issuing a discovery order because a death row habeas petitioner had shown good cause for seeking discovery). In a case similar to this one, where the district court ordered that a capital habeas petitioner be allowed to remove evidentiary evidence from Kentucky to Texas for testing, the Sixth Circuit Court of Appeals held that the party seeking a writ of mandamus had not demonstrated that the district court's order "was even an abuse of discretion." *See Gall,* 865 F.2d at 788. Therefore, there was "certainly" no showing that the mandamus petitioner's right to relief from the order was clear and disputable. *See id.* Accordingly, Petitioners in this case do not have a right to the issuance of a writ of mandamus, because this Court has not abused its discretion.

Furthermore, this Court did not act outside of its authority in providing for Cherrix's access to evidence and for DNA testing funds, even if this Court ultimately finds the DNA results inadmissible. In *Gall,* the Sixth Circuit recognized that the district court had "merely" ordered that the capital habeas petitioner could utilize avenues of discovery; in so doing, the district court had not held that the information obtained through discovery would be admissible. *See id.* at 789 (regarding order that a deposition be taken). The *Gall* court held that "the discretionary act of ordering [discovery] which may yield inadmissible testimony [did not rise] to the level of a judicial usurpation of power warranting the extraordinary relief of mandamus." *Id.* Similarly, in ordering the disbursal of funds for DNA testing, this Court has not made a judgment as to the merits of the habeas petition; that judg-

ment remains for another day. In the event that this Court ultimately determines that the DNA test results are inadmissible, ordering the disbursal of funds for the testing still does not warrant the relief of mandamus. *See id.*

## VI. CONCLUSION

Upon review of the actions that this Court undertook in its January 9, 2001 Order, it is important to emphasize that this Court respects the judgments of the Accomack Circuit Court jury and the Virginia Supreme Court. This Court was called upon to make a judgment about the reasonable necessity of DNA testing services to a condemned habeas petitioner's case. This Court made no proclamation or judgment about Cherrix's claims of innocence.[17] The January 9 Order was not premised on the presumption that the jury wrongly convicted Cherrix. The Court's order granting funds for DNA testing services and providing for the preservation of evidence was grounded in the fact that the habeas petition raises disturbing questions regarding the constitutionality of Cherrix's trial proceedings that are heretofore unanswered.

Inexplicably, the Commonwealth has refused to conduct the DNA tests which could clarify whether Cherrix's constitutional rights have been violated through his conviction and sentence. This Court had the authority to act, despite the Commonwealth's disinterest in addressing the real questions raised by Cherrix's habeas petition. Virginia's recent experience with Earl Washington and others [18] requires the Court to give deliberate reflection upon Cherrix's request. The Court must consider whether the Commonwealth could be wrong in their perplexing refusal to conduct modern DNA testing that would remove nagging questions about this case. The Attorney General ostensibly supports

17. The Court recognizes that claims of innocence by convicted prisoners are common; however, this petition presents a meritorious case for careful consideration.

18. Walter (Tony) Snyder of Alexandria, Virginia, and David Vasquez of Arlington County,

Virginia were also exonerated on DNA evidence. *See* 1996 REPORT, at 14. Mr. Snyder served seven years for a rape and sodomy that he did not commit. David Vasquez was exonerated by DNA evidence after serving five

new legislation affording a limited measure of post-conviction DNA testing in certain cases. Yet, this legislation comes too late for this habeas petitioner, and the federal court is his last resort.[19]

The Court acknowledges that once the DNA tests are performed, the testing could re-affirm that Cherrix committed the crimes of which he was convicted. *See Barnabei v. Angelone*, 214 F.3d 463, 474 (4th Cir.2000) (emphasizing that all of the forensic and DNA evidence offered by the Commonwealth at trial implicated the habeas petitioner, and affirming dismissal of the habeas petition). Such a result would remove the nagging questions surrounding this case that might otherwise undermine confidence in the criminal justice system. In the event that DNA testing re-affirms that Cherrix committed the crimes, this Court will consider the petition for writ of habeas corpus and render judgment accordingly.

years on an unsubstantiated rape and murder conviction. *See id.*

**19.** *See* S.1366. (Va. Feb. 22, 2001) (Virginia Senate bill providing for a procedure for the issuance of a writ of actual innocence and for the preservation and retention of biological evidence), *available at* <http://legl.state.va.us/cgi-bin/legp504exe?011+sum +SB1366>.