**Brian Lee CHERRIX Petitioner,**

v.

**William Page TRUE, Warden, Sussex I State Prison,[1] Respondent.**

**No. CIV.A. 00–1377–AM.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 17, 2001.

---

**1.** William Page True has succeeded Daniel Braxton as the Warden of Sussex I State Prison. Mr. Braxton in turn succeeded Mr. John B. Taylor a Warden.

Robert Lee Jenkins, Bynum & Jenkins, Alexandria, VA, Michele Jill Brace, Charlottesville, VA, for Petitioner.

Pamela Anne Rumpz, Office of the Attorney General, Richmond, VA, for Respondent.

## *OPINION*

LEE, District Judge.

The instant matter arises out of the Court's attempt to implement its January 9, 2001, Order authorizing DNA testing in this capital habeas petition proceeding. *See Cherrix v. Taylor,* No. 00–1377, Order (E.D.Va. Jan. 9, 2001). On September 10,

2001, the Court directed the Assistant Attorney General to provide an inventory of any biological evidence or evidence that may contain biological evidence to the Petitioner for the purpose of identifying the appropriate evidence for DNA testing. *See Cherrix v. Taylor*, No. 00–1377, Order (E.D.Va. Sept. 10, 2001). The Assistant Attorney General provided Petitioner with an inventory of evidence and the present motion concerns Petitioner's attempts to seek answers to several questions concerning the evidence contained in the inventory list submitted by the Assistant Attorney General.

Specifically, Petitioner has filed a Motion for Subpoena Duces Tecum to the custodian of records of the Chincoteague Police Department seeking to compel the production of copies of all documents in the custodian's possession, custody or control that refer or relate to any of the items contained in an inventory list of evidence in the custody of the Chincoteague Police Department submitted by Respondent's counsel to Petitioner on September 11, 2001. The purpose of the motion is to identify the appropriate evidence in the possession of the Chincoteague Police Department for DNA testing.

For the reasons discussed below, the Court denies Petitioner's Motion for Subpoena Duces Tecum. Petitioner's discovery request is overly broad and burdensome and therefore fails to satisfy the "good cause" standard set forth in Rule 6 of the Rules Governing § 2254 Cases. However, the Court finds that the DNA testing ordered by this Court on January 9, 2001, cannot proceed until the preliminary step of identifying the appropriate evidence for testing is completed. Accordingly, in the interests of justice and judicial economy, the Court *sua sponte* grants the Petitioner leave to depose the Chief of the Chincoteague Police Department concern-

ing the items in the September 11th inventory list.

The Petitioner cannot evaluate the appropriate evidence for DNA testing until Respondent answers the questions concerning the items in the Chincoteague Police Department inventory list. Based on the presentations of counsel at oral argument on November 9, 2001, the Court finds that Edward Luis, the current Chief of Police for Chincoteague and a former officer who participated in the investigation of Ms. Tessa Van Hart's murder, could provide the answers to the questions posed by Petitioner concerning the evidence in the custody of the Police Department. Deposing Chief Luis will ensure that the DNA testing proceeds quickly to the next stage, preventing further delay in an already long stalled process. Moreover, the deposition is appropriate to effectuate and prevent the frustration of this Court's Order instructing agents of the Commonwealth to provide Petitioner access to biological evidence in the possession of the Commonwealth for DNA testing and the Court's Order seeking to implement the procedures for such testing.

## I. BACKGROUND

### A. The January 9th Order Authorizing DNA Testing.

In 1997, habeas petitioner Brian Lee Cherrix was convicted of the 1994 murder and sodomy of Tessa Van Hart. The harrowing facts of the case are set forth in *Cherrix v. Commonwealth*, 257 Va. 292, 513 S.E.2d 642 (1999). In connection with his federal petition for writ of habeas corpus, and pursuant to 21 U.S.C. § 848(q), Petitioner filed a motion for DNA retesting of the seminal fluid collected from Ms. Van Hart's anus in the investigation of her murder. The DNA test results of the seminal fluid conducted in 1994 had proven inconclusive and therefore could not ascer-

tain the identity of the assailant who murdered and sodomized Ms. Van Hart. In his motion for retesting of the DNA, Cherrix argued that technology had evolved to enable a conclusive determination of the origin of the seminal fluid. Thus, retesting of DNA could support Cherrix's claims of actual innocence and he argued that the testing was reasonably necessary to support his habeas petition.

This Court agreed. On January 9, 2001, the Court granted Petitioner's Motion for the Retention and Preservation of Evidence and Motion for DNA Testing. *See Cherrix v. Taylor,* No. 00–1377, Order (E.D.Va. Jan. 9, 2001) (" January 9th Order"); *Cherrix v. Braxton,* 131 F.Supp.2d 756 (E.D.Va.2000) (supplemental opinion explaining authority for issuance of January 9th Order), *aff'd sub nom. Cherrix v. Braxton,* 258 F.3d 250 (4th Cir.2000). In that Order, this Court directed Pamela A. Rumpz, in her capacity as the Assistant Attorney General, "to notify the state officials in possession of the evidence concerning the murder of Tessa Van Hart to take steps to preserve all evidence in their care, custody, and control until further order of the Court. Such evidence includes bodily fluids, and other tangible objects in the care, custody or control of the Commonwealth of Virginia and the Clerk of the Court for the Accomack County Circuit Court." Jan. 9th Order at 8–9. The Order further directed the Attorney General and Samuel Cooper, Jr., in his capacity as the Clerk of the Court for the Accomack County Circuit Court, "to make available to Petitioner any bodily fluids or swabs seized from Tessa Van Hart, or the Petitioner, for testing as directed by the Court." *Id.* at 8. On July 9, 2001, the United States Court of Appeals for the Fourth Circuit affirmed the Court's January 9th Order in *Cherrix v. Braxton,* 258 F.3d 250 (4th Cir.2001).

**B. Implementation of the DNA Testing Procedure.**

The Court conducted a teleconference with the parties on September 4, 2001, to solicit input on how to implement the January 9th Order. The Court requested information from the parties concerning, *inter alia,* what evidence should be tested, the method of preserving evidence for chain of custody purposes during the testing process, the type of DNA analysis to be utilized, the schedule for the DNA testing, and the laboratory that will administer the tests. (Tr. of Sept. 4, 2001 Teleconference) ("Sept. 4th Tr.") The teleconference focused on identifying the evidence available for testing. Peter Neufeld, counsel for the Petitioner and head of the Innocence Project at Benjamin Cardozo School of Law, contended, and this Court agreed, that as a preliminary matter, the biological evidence and evidence that may contain biological evidence needed to be identified before any further steps could be taken. (*Id.* at 12–13, 17). Mr. Neufeld explained that an inventory of the evidence would assist in the identification of evidence that could have seminal fluid and other relevant biological evidence that was not subject to DNA testing in the past, such as collected articles of clothing. (*Id.* at 3–7). An inventory of the available evidence would also reveal items that could be used to compare to the anal swab. Based on the September 4th teleconference, the Court issued an Order on September 10, 2001, directing that on or before September 11, 2001, the Assistant Attorney General, provide counsel for the Petitioner with an inventory of all the biological evidence, and any evidence that may contain biological evidence, in the custody or control of the Commonwealth of Virginia and the Clerk of the Court for the Accomack County Circuit Court pertaining to the murder of Tessa Van Hart. *See Cherrix v. Taylor,*

No. 00–1377, Order (E.D.Va. Sept. 10, 2001) ("*September 10th Order*").[2]

The Assistant Attorney General provided Petitioner with two lists of evidence, one from the Clerk of the Accomack County Circuit Court and one from the Chincoteague Police Department on September 11, 2001. (Pet.'s Mem. in Supp. of Mot. for Subpoena Duces Tecum Ex. 1: Letter from Assistant Attorney General to Counsel for Petitioner of 9/11/01). On September 13, 2001, counsel for Petitioner responded to the lists maintaining that the descriptions on the list were inadequate to determine whether the information was relevant to DNA testing. (Pet.'s Mem. in Supp. of Mot. for Subpoena Duces Tecum Ex. 2: Letter from Counsel for Petitioner to Assistant Attorney General of 9/13/01).

The September 13th Letter raised numerous questions seeking to clarify several entries on the lists. (*Id.*) For example, the Letter noted that item # 55 in the Chincoteague Police Department list submitted by the Assistant Attorney General is identified simply as "blood, saliva, and hair." (*Id.* at 2). The September 13th Letter requested the Assistant Attorney General to identify whose blood, saliva and hair was collected at the crime scene. (*Id.*) Other questions raised by the Letter addressed items that may contain biological material. For instance, item # 32 is identified as "two white socks, blue cotton shirt (long sleeve), blue cotton T–Shirt (Georgetown Hoyas), bra, blue apron, envelope with hair." Petitioner asked the Assistant Attorney General to answer whether such clothing was removed from Ms. Van Hart's

body. (*Id.* at 4). In a two sentence response, the Assistant Attorney General indicated that she could not answer any questions concerning the inventory lists because neither she, nor her office, worked on the Van Hart case. (Pet.'s Mem. in Supp. of Mot. Subpoena Duces Tecum Ex. 3: Letter from Assistant Attorney General to Counsel for Petitioner of 9/14/01).

## C. The Instant Subpoena Duces Tecum Motion

On September 20, 2001, Petitioner filed a motion for subpoena duces tecum "that commands the custodian of records at the Chincoteague Police Department to produce to Cherrix's counsel, within 10 days of service, copies of all documents in his possession, custody or control that refer or relate to any of the items contained on the list submitted by [the Assistant Attorney General] on September 11, 2001," compiled by the Chincoteague Police Department. (Pet.'s Mem. at 4). Notwithstanding that the responsibility to provide the information lies with the Assistant Attorney General and the Warden, Petitioner argues that obtaining the information directly from the custodian would be in the best interests of efficiency considering the Warden's recalcitrant history in this case. Petitioner further argues that the Court has good cause to grant the discovery request because the Court has already directed the parties to submit protocols for the DNA testing. Determining what evidence should be tested, the Petitioner contends, is a necessary pre-requisite to the DNA testing. The Warden opposes the motion

---

**2.** The September 10th Order also directed: (1) Petitioner to submit a proposed DNA testing plan to counsel for the Respondent on September 18, 2001; (2) the parties to confer with one another prior to September 21, 2001, to determine what DNA testing matters they can agree to; and (3) the parties to submit by September 21, 2001, a single memorandum outlining the DNA procedures the parties have reached agreement on. *See* Sept. 10, 2001 Order at 3. The contentions concerning the preliminary issue of identifying the material available for testing raised in the instant proceeding has effectively stalled the DNA testing schedule.

maintaining that Petitioner has not demonstrated good cause for a "fishing expedition" through the Police Department's files, the information sought lies outside the scope of the Court's January 9th Order, and the documents requested are privileged.

The Court heard oral argument in this matter on November 9, 2001. At oral argument, the Assistant Attorney General, Pamela Rumpz, indicated that she had traveled to the Chincoteague Police Department to review the evidence in its custody. (Tr. of Nov. 9, 2001, Hr'g before J. Lee, at 5–6) ("Nov. 9th Tr.") She related that she met with Edward Luis, Chief of the Police Department, who as an officer had participated in the investigation of Ms. Van Hart's murder. (*Id.* at 6, 9). Much to the concern of the Court, Ms. Rumpz revealed that the integrity of much of the evidence in the custody of the Chincoteague Police Department is severely compromised. (*Id.*)[3] Upon questioning of the Court, Ms. Rumpz indicated that some of the evidence stored in plastic bags may be less compromised than others. (*Id.* at 8–9). Also at oral argument, counsel for Petitioner repeatedly conceded that what Petitioner ultimately was seeking was someone with information about the various items in the list to answer the questions posed in the September 13th Letter. (*Id.* at 12, 15).

## II. STANDARD OF REVIEW

Rule 6(a) of the Rules Governing 28 U.S.C. § 2254 provides:

A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

*Bracy v. Gramley,* 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting Rule 6(a)); *See also Jenkins v. Scully,* 1992 WL 32342, * 2 (W.D.N.Y.1992) ("any discovery contemplated by the Federal Rules of Civil Procedure may be ordered in a proceeding under 28 U.S.C. § 2254.").

The Fourth Circuit explains that "a petitioner demonstrates 'good cause' for habeas discovery 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'" *Royal v. Taylor,* 188 F.3d 239, 249 (4th Cir.), *cert. denied,* 528 U.S. 1000, 120 S.Ct. 465, 145 L.Ed.2d 379 (1999) (quoting *Bracy,* 520 U.S. at 908–09, 117 S.Ct. 1793); *see also Quesinberry v. Taylor,* 162 F.3d 273, 279 (4th Cir.1998) (same). In fact, where specific allegations demonstrate that the petitioner may be able to show that he is "entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Murphy v. Johnson,* 205 F.3d 809, 814 (5th Cir.2000) (citing *Bracy,* 520 U.S. at 909, 117 S.Ct. 1793).

## III. DISCUSSION

This Court has already determined that Petitioner has demonstrated "good cause" to make limited processes of discovery available to Petitioner. *See Cherrix,* 131 F.Supp.2d at 775. Specifically, in its Janu-

---

**3.** The Court finds the Assistant Attorney General's reports that the evidence was lying in torn paper bags, mixed up with other exhibits and in general disarray particularly disconcerting. (Nov. 9th Tr. at 7–9). This is especially troublesome in light of the Court's January 9th Order directing the Assistant Attorney General to notify state officials to take the appropriate steps to preserve the evidence in their custody. *See* Jan. 9th Order at 8.

ary 9th Order, the Court found "good cause" to direct the Assistant Attorney General to make available to Petitioner any bodily fluids or swabs seized from Ms. Van Hart, or the Petitioner, for DNA testing. *See id.* at 776–77. To protect the evidence in the case, the Court also ordered the Assistant Attorney General to notify the state officials in possession of the evidence pertaining to Ms. Van Hart's murder to take steps to preserve all evidence in their care, custody or control until further order of the Court. *See id.* at 781–783. Petitioner's instant motion for subpoena duces tecum arises out of the Court's attempt to implement the January 9th Order and whether there exists "good cause" to grant Petitioner's discovery request.

### A. The Subpoena Duces Tecum Motion.

As determined at the September 4th teleconference and in the September 10th Order, the Court concluded that the logical first step in the DNA testing process would be to determine what evidence should be tested. Accordingly, the Court directed the Assistant Attorney General to provide counsel for the Petitioner with an inventory of all the biological evidence, and any evidence that may contain biological evidence, in the custody or control of the Commonwealth. The Assistant Attorney General complied with the September 10th Order by providing counsel for the Petitioner with two inventory lists on September 11th. Although Petitioner's September 13th Letter raised questions concerning items in both lists, the subpoena duces tecum only concerns the items referenced in the inventory list from the Chincoteague Police Department.

In the September 13th Letter, the Petitioner raised several valid questions concerning the items in the Chincoteague Police Department tailored toward determining whether the evidence is relevant for DNA testing purposes. For instance, with respect to item # 55 in the Police Department's list, identified solely as "blood, saliva and hair," the Letter asked the Assistant Attorney General to identify whose blood or saliva the item referenced. The September 13th Letter asked similar questions of other items in the Police Department's list. For instance, item # 14A is identified as "swab from stain on rear door of car." Petitioner asked the Assistant Attorney General to identify whether # 14A consisted of multiples swabs, where on the car it was collected and whether it contained Ms. Van Hart's blood. (Pet.'s Mem. in Supp. of Mot. for Subpoena Duces Tecum Ex. 2: Letter from Counsel for Petitioner to Assistant Attorney General of 9/13/01, at 3). The List identifies item # 21 as "control swab for item # 20," which is in turn labeled as "swab from stain on back steps @ 7156 Piney Isl. La. & Picture Frame." Petitioner requested the Assistant Attorney General to identify the source of the swab and whether it contained blood from Ms. Van Hart. (*Id.*) Other questions raised by the Petitioner's September 13th Letter addressed evidence that may contain biological material. For instance, item # 32 is identified as "two white socks, blue cotton shirt (long sleeve), blue cotton T–Shirt (Georgetown Hoyas), bra, blue apron, envelope with hair." Petitioner asked the Assistant Attorney General to answer whether such clothing was removed from Ms. Van Hart's body. (*Id.* at 4).

Many of the questions raised in the September 13th Letter go directly to determining what evidence should be submitted for DNA testing. Yet the Assistant Attorney General refused to answer any of the

questions.[4] Since the Assistant Attorney General would or could not answer the questions raised by Petitioner in the September 13th Letter, the Petitioner selected to seek the information from somewhere else—the documents in the custody of the Chincoteague Police Department concerning Ms. Van Hart's murder.

■ Contrary to the Assistant Attorney General's contentions, the information sought by the Petitioner does not lie outside the scope of this Court's January 9th Order, or the Court's September 10th Order for that matter. To be sure, the focus of the DNA testing is the seminal fluid contained in the anal swab removed from the victim's body. But a proper DNA analysis cannot be based on the testing of one sample. It is important to identify possible materials that may contain seminal fluid or blood that was not discovered the first time around for a variety of reasons. (Sept. 4th Tr. at 3–7). The recommendations contained in the National Commission on the Future of DNA Evidence, a report sponsored by the Attorney General of the United States, support identifying all the appropriate evidence for DNA testing. *See* National Comm'n on the Future of DNA Evidence, POSTCONVIC-TION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS at 34, *available at* http://www.ncjrs.org/txtfiles1/nij/177626.tx. ("Report"). The Report confirms that in "older cases appropriate evidentiary samples or standard may not have been available or recognized as relevant and/or were unsuitable for testing with DNA tests

available at the time." *Id.* Most pertinent to the instant case, the Report concludes that "[r]evaluation of collected evidence samples may lead to the identification of other relevant biological samples that had been previously undetected, or previously tested items that may give conclusive results with current techniques." *Id.*

■ On their face, neither the January 9th Order, nor the September 10th Order, are limited to the seminal fluid. The January 9th Order directed Assistant Attorney General "to make available to Petitioner *any bodily fluids or swabs* seized from Tessa Van Hart, or the Petitioner, for testing as directed by the Court." Jan. 9th Order at 8–9 (emphasis added). Moreover, the January 9th Order directed the Assistant Attorney General to direct state officials "to take steps to preserve *all evidence* in their care, custody, and control until further order of the Court . . . including bodily fluids and *other* tangible objects . . . ." *Id.* at 8 (emphasis added). The September 10th Order directed the Assistant Attorney General to provide an inventory of *all* the biological evidence to determine what items may be suitable for DNA testing. Sept. 10th Order at 3.

The information previously sought in the September 13th Letter, and now in the subpoena duces tecum, goes directly to establishing what evidence is available to be tested and thus drives to the heart of the matters pending before the Court. The Petitioner is not seeking to obtain the

4. At oral argument, the Assistant Attorney General maintained that no one could vouch for the integrity of the evidence in the custody of the Chincoteague Police Department. (Nov. 9th Tr. at 8). Perhaps this helps explain the Assistant Attorney General's two sentence response to Petitioner's September 13th Letter. But the Court is puzzled that the Assistant Attorney General did not relay the status of the evidence to the Petitioner in her

September 14th response to Petitioner's inquiries. Further, the Court questions why the Assistant Attorney General did not forward the questions raised by the Petitioner to Chief Luis with whom she had discussed the inventory of evidence. The quickness of the response to Petitioner's questions—one day—suggests that the Assistant Attorney General did not make a substantial effort to answer Petitioner's queries.

494

items for testing at the moment. That matter will be addressed in a later hearing once the parties have determined what evidence is appropriate. At present, the Petitioner is merely seeking information to evaluate what evidence should be tested. And determining what evidence is appropriate for testing is the crucial first step in this long-delayed process.

█ Notwithstanding that there exists good cause for the information Petitioner seeks, the means he has selected to obtain that information is too broad for this Court to countenance. Petitioner's request to compel production of *all* the documents that *refer or relate to any of the items* contained on the list casts far too wide a net. At oral argument, the Assistant Attorney General indicated that such a request would include hundreds, if not thousands of documents. (*See* Nov. 9th Tr. at 7). Moreover, according to the Assistant Attorney General, because the file is in such a state of disarray, it could take the Police Department a substantial amount of time to sort through the material to find the relevant documents. (*See Id.*) Many of these documents may only be tangentially related to Petitioner's request. Viewed in this light, Petitioner's discovery request begins to resemble a "fishing expedition" in the sense that it is overly broad and burdensome for the Chincoteague Police Department to provide all the requested documents. Accordingly, the Court denies Petitioner's motion for subpoena duces tecum to compel the production of all the documents within the Department's possession that refer or relate to the items contained in the evidentiary inventory list.

### B. The Deposition of Chief Luis.

That is not the end of the matter, however. The Court is caught between the proverbial Scylla and Charybdis. The Court is compelled to deny Petitioner's

subpoena duces tecum motion because it is overly broad and burdensome and could lead to further delay. However, the information the Assistant Attorney General refused to provide concerning the items listed in the Police Department's inventory list is necessary for the Petitioner to evaluate what evidence should be tested. Simply put, the DNA testing process cannot move forward until the essential first step of identifying what evidence should be tested is accomplished.

### 1. Granting leave to depose Chief Luis.

█ In light of the special circumstances of this case, in the interests of justice and judicial economy, the Court will grant the Petitioner leave to depose the Chief of the Chincoteague Police Department, Edward Luis, concerning the items contained in the inventory list compiled by the Department and submitted by the Assistant Attorney General to the Petitioner on September 11th. Since the Assistant Attorney General indicates that she cannot answer the questions posed by the Petitioner, the Court will give the Petitioner the opportunity to ask its questions of someone who can. Based on the presentations of counsel at oral argument on November 9, 2001, the Court finds that Chief Luis, a former officer who participated in the investigation of Ms. Van Hart's murder, is qualified to answer the questions posed by Petitioner concerning the evidence in the custody of the Police Department.

Granting leave to depose Chief Luis will ensure that the DNA testing proceeds quickly to the next stage, preventing further delay in an already long stalled process. Further, a deposition of Chief Luis is preferable to compelling the Police Department to locate and then provide thousands of documents concerning Ms. Van

Hart's murder, many of which may only be tangentially related to the evidence set forth in the inventory list. Indeed, at oral argument, counsel for Petitioner effectively conceded that what Petitioner ultimately sought is someone with information about the various items in the list to answer the questions posed in the September 13th Letter. If anyone can answer these questions, it is Chief Luis.[5]

To ensure a narrow scope and prevent the relitigation of issues immaterial to the instant habeas petition, the deposition shall be sharply limited to questions concerning the items in the inventory list compiled by the Chincoteague Police Department described in the September 11th Letter. The substance of the deposition will be circumscribed to the questions raised by the Petitioner in his September 13th Letter concerning the items in the Police Department's inventory list. To the extent necessary, Chief Luis is directed to bring with him to the deposition any documents which may facilitate the answers to the questions stated in the Petitioners' September 13th Letter.[6] Counsel for the Petitioner and the Attorney General *are not to engage in* questioning about the details of the investigation of the case, *e.g.,* what investigators questioned what witnesses, witnesses' statements, etc. Chief Luis may offer hearsay answers regarding the source or origin of evidentiary items at the deposition. The point of this inquiry is extremely limited. If necessary, the parties are instructed to contact Magistrate Judge Thomas Rawles Jones, Jr. to re- solve any evidentiary issues via teleconference that may arise in connection with the deposition. The parties are further instructed to contact Judge Jones to ensure his availability by telephone the day(s) the deposition is scheduled. The deposition shall be completed no later than January 24, 2001.

### 2. The Court's authority under the writ of habeas corpus and the All Writs Act.

 The Court deems that granting Petitioner leave to depose Chief Luis *sua sponte* is an appropriate exercise of its authority and discretion pursuant to its plenary power of inquiry under the writ of habeas corpus and the All Writs Act, 28 U.S.C. § 1651. (2000). As Justice Fortas wrote in *Harris v. Nelson,* "the very nature of the writ [of habeas corpus] demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." 394 U.S. 286, 291, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). The "language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary." *Id.* at 292, 89 S.Ct. 1082 (citations omitted). The Supreme Court has made clear that a district court "has a wide-range of powers in administering the writ and ensuring that the proceeding does not 'founder in a procedural morass.'" *Ainsworth v. Vasquez,* 759 F.Supp. 1467, 1475

---

**5.** As noted earlier, the Assistant Attorney General has indicated that she believes no one, including Chief Luis, can vouch for the integrity of the evidence in the custody of the Chincoteague Police Department. (Nov. 9 Tr. at 8). The Assistant Attorney General also indicated that some evidence may be less compromised than others. (*See Id.*) Deposing the Chief will conclusively determine what evidence in the Department's possession is appropriate for testing, from the standpoint of integrity, which is the Assistant Attorney General's concern, as well as relevance.

**6.** These items or documents, including police reports, may be reviewed by counsel for Petitioner, but not copied, for purposes of questioning the fullness of the identification of the source of evidence.

(E.D.Cal.1991) (quoting *Harris*, 394 U.S. at 292, 89 S.Ct. 1082); *see also Sanders v. United States*, 373 U.S. 1, 22, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (acknowledging that a federal district judge "is free to adopt any appropriate means for inquiry into the legality of the prisoner's detention in order to ascertain all possible grounds upon which the prisoner might claim to be entitled to relief.").

 That is why within the context of a habeas proceeding the Supreme Court has found that the All Writs Act, 28 U.S.C. § 1651, provides a court with the authority to "fashion such discovery procedures as is deemed necessary to ensure meaningful adjudication of the claim." *United States v. Shakir*, 113 F.Supp.2d 1182, 1190 (M.D.Tenn.2000) (citing and discussing *Harris*, 394 U.S. at 300, 89 S.Ct. 1082). In general, the "courts have long recognized that the purpose of the All Writs Act is to provide the instruments necessary to perform their duty" and thus, "courts may rely on this statute to issue orders necessary for conducting factual inquiries." *United States v. Li*, 55 F.3d 325, 329 (7th Cir.1995) (citing *Harris*, 394 U.S. at 300, 89 S.Ct. 1082) (affirming district court's decision to issue an order requiring defendants to provide handwriting exemplar under All Writs Act). The Supreme Court has expounded that the All Writs Act provides the federal courts with the power "as may be necessary or appropriate to effectuate and prevent the frustration of an order it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (citing *Harris*, 394 U.S. at 299, 89 S.Ct. 1082).

The All Writs Act takes on special significance during a habeas proceeding.

At any time in the proceedings, when the court considers it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly 'dispose of the matter as law and justice require,' either *on its own motion* or upon cause shown by the petitioner, it may issue such writs and take or authorize such proceedings with respect to development, before or *in conjunction with the hearing of the facts relevant to the claims advanced by the parties*, as may be 'necessary or appropriate in aid of [its jurisdiction] [...] and agreeable to the usages and principles of law.'

*Harris*, 394 U.S. at 300, 89 S.Ct. 1082 (quoting 28 U.S.C. § 1651) (emphasis added).

The deposition of Chief Luis will directly advance the development of the crucial fact at issue in Petitioner's habeas proceeding—DNA testing of the biological evidence. As elaborated above, the Court issued an Order directing the Respondent to provide the Petitioner with access to biological evidence for DNA testing. Jan. 9th Order at 8–9. The Court further ordered Respondent to provide an inventory of the evidence in custody to evaluate the material to be tested. Sept. 10th Order at 3. Although Respondent provided an inventory list, Petitioner raised several valid questions concerning the evidence that would assist in evaluating what evidence should be tested. Respondent refused to answer the questions.

Directing the deposition of Chief Luis is "appropriate to effectuate and prevent the frustration of [the Orders, this Court] has previously issued in its exercise of jurisdiction" in this case. *See New York Telephone Co.*, 434 U.S. at 172, 98 S.Ct. 364. The DNA testing process cannot proceed until the preliminary step of identifying the appropriate evidence to be tested is completed. Deposing an officer who can answer the questions raised in Petitioner's Sep-

tember 13th Letter will ensure that this proceeding does not "founder in a procedural morass." *Harris*, 394 U.S. at 292, 89 S.Ct. 1082. Depositions are an accepted means of obtaining information in a habeas proceeding. *See* 28 U.S.C. § 2246 (2000) ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or in the discretion of the judge, by affidavit."). In fact, courts frequently rely on depositions as an appropriate discovery device in habeas proceedings. *See, e.g., Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (directing lower court to permit discovery, including depositions of witnesses, in conjunction with habeas petition). Finally, deposing Chief Luis will avoid the unnecessary expense and delay of testing all the evidence in the inventory without any reason to believe that such testing would produce some valuable piece of information. The "procedural requirements of a habeas corpus hearing" require that the court meet "[t]he demand for speed, flexibility and simplicity." *Hensley v. Municipal Ct.*, 411 U.S. 345, 350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Harris*, 394 U.S. at 300, 89 S.Ct. 1082. Deposition of Chief Luis will meet these demands without unreasonably burdening the Respondent.[7]

## IV. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Petitioner's Motion for Subpoena Duces Tecum is DENIED. It is further ORDERED that Petitioner is GRANTED leave to depose the Chief of the Chincoteague Police Department, Ed-

ward Luis, in accordance with the following conditions:

(1) the inquiry shall be limited to the inventory list of evidence in the custody of the Chincoteague Police Department submitted by the Assistant Attorney General to Petitioner on September 11, 2001; and

(2) the scope of the questions shall be circumscribed to those inquiries raised by the Petitioner in his September 13th Letter submitted to counsel for the Respondent concerning the Police Department's evidentiary inventory list and further limited in accordance with the directions set forth in section III.C.1, *supra*, of this Opinion.

The Clerk is directed to send copies of this Order to all counsel of record.

---

7. Under these circumstances, directing the deposition of Chief Luis is similar to when a court exercises its inherent power to manage its docket in an efficient manner to ensure the resolution of a pending matter. *See Ainsworth*, 759 F.Supp. at 1474–75 (upholding magistrate judge's decision to *sua sponte* set hearings at which magistrate judge proposed

· to question petitioners in a habeas proceeding concerning the existence of any exhaustion claims). *Cf. Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.1994) (affirming lower court's *sua sponte* ruling that the plaintiffs may depose the defendants' attorneys only by written questions).